Slip Op. 03-48

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

_____

|  |  |  |
|---|---|---|
| PAM, S.p.A., | : | |
| Plaintiff, | : | |
| v. | : | |
| UNITED STATES DEPARTMENT OF COMMERCE, | : | Court No. 02-00144 |
| | : | **Public Version** |
| Defendant, | : | |
| and | : | |
| NEW WORLD PASTA COMPANY, | : | |
| Defendant-Intervenor. | : | |

_____

[Plaintiff's Motion for Judgment Upon an Agency Record is Denied.]

Dated: May 8, 2003

*Riggle and Craven, David A. Riggle* and (*David J. Craven*), for Plaintiff.

*Robert D. McCallum, Jr.*, Assistant Attorney General, United States Department of Justice, *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, (*Lucius B. Lau*), Assistant Director, (*David A. Harrington*), Trial Attorney; *Elizabeth Cooper Doyle,* Office of Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant.

*Collier Shannon Scott, PLLC, Paul C. Rosenthal*, *David C. Smith*, and (*Adam H. Gordon*), for Defendant-Intervenor.

**OPINION**

**BARZILAY, JUDGE:**

**I. INTRODUCTION**

Plaintiff PAM S.p.A. ("PAM")[1] filed a USCIT R. 56.2 Motion for Judgment Upon an Agency Record, challenging certain aspects of the Department of Commerce's ("Commerce" or "Department") determinations in the antidumping administrative review that it conducted concerning PAM. *See Notice of Final Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Duty Administrative Review and Revocation of Antidumping Duty Order in Part: Certain Pasta From Italy*, 67 Fed. Reg. 300 (Jan. 3, 2002) ("*Final Results*"). This Court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c).

**II. BACKGROUND**

On July 24, 1996, Commerce published in the Federal Register an antidumping duty order on certain pasta from Italy.[2] *See Notice of Antidumping Duty Order and Amended Final Determination of Sales at Less Than Fair Value: Certain Pasta From Italy*, 61 Fed. Reg. 38,547 (July 24, 1996). On July 20, 2000, Commerce published in the Federal Register notice of the "Opportunity to Request an Administrative Review" of this order for the period covering United States sales between July 1, 1999 and June 30, 2000. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 65

---

[1] Formerly Prodotti Alimentari Meridionali, S.r.l.

[2] The subject merchandise is classifiable under item 1902.19.20 of the Harmonized Tariff Schedule of the United States.

Fed. Reg. 45,035 (July 20, 2000). Borden, Inc. and New World Pasta requested an administrative review on September 6, 2000 and that same day, Commerce initiated the administrative review of the antidumping duty order on pasta from Italy. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part*, 65 Fed. Reg. 53,980 (Sept. 6, 2000).

On September 13, 2000, Commerce sent its questionnaire to PAM and the other respondents. PAM submitted its responses to sections A through C of the questionnaire by November 15, 2000. Commerce sent PAM a supplemental questionnaire requesting information about pasta cuts and their production on December 14, 2000. PAM submitted its section D responses pursuant to the Department's instructions by January 16, 2001. *See Def.-Int.'s App.* Ex. 3. On February 21, 2001, Commerce sent PAM another supplemental questionnaire seeking information concerning, among other things, a new production line at its D'Apuzzo facility.

In its section D response, PAM claimed a startup adjustment pursuant to 19 U.S.C. § 1677b(f)(1)(C) (1999), related to the installation of a "new production line" in its existing D'Apuzzo facility and stated that it had "remodeled an existing facility by addition of new machinery." *Id*. at 22. The Department's questionnaire also requested that PAM "explain how the production levels were limited by technical factors associated with the initial phase of commercial production." *Id.* at 23. PAM responded that the question "does not apply" because its new line did not begin to operate during the period of review ("POR"). *Id.*

On June 28, 2001, Commerce preliminarily determined that PAM sold the subject

merchandise at less than normal value ("NV")[3] with a dumping margin of 4.48 percent and denied PAM's requested startup adjustment. *See Notice of Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review and Intent To Revoke Antidumping Duty Order in Part: Certain Pasta From Italy*, 66 Fed. Reg. 34,414 (June 28, 2001) ("*Preliminary Results*").

In its supplemental questionnaire to PAM, Commerce noted that PAM had "failed to provide all the information requested in the original questionnaire regarding these startup costs." *Def.-Int.'s App*. Ex. 4 at 1. PAM responded it had added "new machinery" in the form of a "new long cut production line," which required periodic closures of the plant. *Id.* at 2. PAM maintained that "production levels were limited because the new line was not yet ready to produce pasta and the existing lines could not produce pasta because the installation of the new line made it impossible for the old line to operate." *Id.* at 4. Commerce denied the request in the *Preliminary Results*, determining that PAM did not meet the criteria for a startup adjustment pursuant to 19 U.S.C. § 1677b(f)(1)(C)(ii). *Preliminary Results* at 34,419. Specifically, Commerce concluded that the new line did not constitute a "new production facility" or a "new product" that required substantial additional investment, and the new line did not constitute a "substantial retooling" of its existing facility. Commerce determined the addition of a new production line within an already existing facility was a "mere improvement," which, as the Uruguay Round Agreements Act, Statement of Administrative Action ("SAA")[4] states, does not

---

[3] Normal value is the weighted average price of the subject merchandise in the producer's home market. *See* § 1677b.

[4] The SAA "represents an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements, both for

qualify for a startup adjustment.

On August 7, 2001, Commerce received PAM's administrative case brief. In a December 5, 2001 letter, PAM supplemented its brief with a request that Commerce combine shape categories 5 (short cuts), 6 (specialty short cuts), and 7 (soupettes), asserting that Commerce acknowledged that it erred with respect to this issue in the judicial review of the third administrative review. *See Final Results* at 300 n.2. In the *Final Results*, Commerce declined to combine shape categories, explaining that Commerce's remand request in the prior judicial review, which PAM claimed to be a "clear and unequivocal" admission of error, was simply a request for an opportunity to "review the record with regard to shape categories." *Id*. at 300.

On January 3, 2002, Commerce published the final results of the administrative review, again denying the startup adjustment and determining PAM's dumping margin to be 4.10 percent. *Id*. at 302. Commerce rejected PAM's request that its margin be calculated by comparing the weighted average of normal values to entire invoices and, instead, followed the standard methodology of comparing the weighted average of normal values to individual transactions. *See Issues and Decision Memorandum for the Fourth Antidumping Duty Administrative Review; Final Results of Review* (Jan. 3, 2001) ("*Issues and Decision Memo*") at 12 (citing 19 C.F.R. § 351.414(c)(2)). Commerce also declined to permit PAM's non-dumped sales to be used to offset the dumping margins on sales that had been dumped. *Id.*

On February 28, 2002, PAM filed a complaint with this court, alleging that the

_____

purposes of U.S. international obligations and domestic law. . . . Moreover, since this Statement will be approved by Congress at the time it implements the Uruguay Round agreements, the interpretations of those agreements included in this Statement carry particular authority." SAA at 656, H.R. Doc. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040.

Department's determination was unsupported by substantial evidence on the record and was

otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(B)(1)(B)(i). On October 7, 2002,

PAM moved for Judgment upon an Agency Record pursuant to USCIT R. 56.2.

### III. DISCUSSION

PAM challenges four separate issues in this case: first, whether Commerce's denial of a

startup adjustment for PAM's new production line is supported by substantial evidence and is in

accordance with law; second, whether the Department's calculation of PAM's dumping margin

using the average-to-transaction method is in accordance with law; third, whether the Department

erred by "zeroing"[5] negative margins on individual transactions when calculating PAM's

dumping margin; and fourth, whether the Department erred in its classification of certain pasta

shapes.

This court must evaluate whether the findings in question are supported by substantial

evidence on the record and are otherwise in accordance with law. *See* § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197*,* 229 (1938);

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

---

[5] "Zeroing" is the methodology of assigning zero to margins with "negative" values. *See infra* Section C.

A.    COMMERCE'S DETERMINATION TO DENY A STARTUP ADJUSTMENT FOR PAM'S NEW PRODUCTION LINE IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW.

PAM claimed a startup adjustment for its new pasta production line at its D'Apuzzo facility equal to the amount of the fixed overhead attributed to the period of time during which the D'Apuzzo facility was closed for the installation of the production line.  In the *Final Results*, Commerce denied PAM's request for a startup adjustment, finding that the statutory criteria had not been satisfied.

To qualify for a startup adjustment, a producer must satisfy two requirements under the statute.  In particular, Commerce will make an adjustment for startup costs when:

I) a producer is using new production facilities or producing a new product that requires substantial additional investment, and

II) production levels are limited by technical factors associated with the initial phase of commercial production.

19 U.S.C. § 1677b(f)(1)(C)(ii) (1999).

The statute does not define "new product" and "new production facility."  *See Pohang Iron and Steel Co. v. United States*, 23 CIT 778, 782 (1999).  However, the Department looks to the SAA for the interpretation of these terms.  "'New production facilities' include[] the substantially complete retooling of an existing plant.  Substantially complete retooling involves the replacement of nearly all production machinery or the equivalent rebuilding of existing machinery.  A 'new product' is one requiring substantial additional investment."  SAA at 836.

Consistent with the SAA's requirements, Commerce determined that the addition of a pasta production line to an already existing facility is a "mere improvement," and not a "new

facility" or "substantially complete retooling." *See Preliminary Results* at 34,419. "Mere improvements to existing products or ongoing improvements to existing facilities will not qualify for a startup adjustment." SAA at 836.

On the other hand, PAM contends that the addition of a new production line does not constitute a "mere improvement," but rather constitutes a "substantial improvement tantamount to the opening of a new factory." *Pl.'s Br.* at 6. In support, PAM argues that because "mere" is not assigned a statutory definition, a dictionary must be consulted to ascertain its plain meaning. However, the Supreme Court has consistently held, and this Court has followed its lead as it must, that when the statute is ambiguous on an issue, the court will uphold Commerce's reasonable interpretations of the statute. *See Chevron*, 467 U.S. at 843. Commerce limits the definition of a new production facility to include only those involving substantially complete retooling whereas PAM contends that a substantial investment alone will qualify as a "new production facility." Commerce's interpretation, consistent with the SAA, is clearly reasonable. PAM's interpretation would make any substantial investment tantamount to a "new production facility" and essentially render that phrase in § 1677b(f)(1)(C)(ii)(I) superfluous. Such an interpretation is contrary to the intent of the statute.

To support its claim for a startup adjustment, PAM cites its financial data as evidence of a "substantial improvement." PAM reiterates that the increase in its production capabilities, [[   ]][6] times that of the old line, is "substantial and significant." *Pl.'s Reply* at 4. In addition, PAM allegedly increased total production capacity by nearly [[   ]]%, more than [[      ]] the value of the old plant. *Pl.'s Br.* at 7. Even if these assertions are assumed to be true, such

---

[6] Confidential information is set in double brackets and omitted from the public version.

statistics are not a basis for a startup adjustment pursuant to the statute. That PAM greatly expanded capacity or incurred significant costs in establishing the new line does not affect its eligibility for a startup adjustment "without a showing that the sizeable investment was geared toward the production of a new product or a new production facility." *Pohang*, 23 CIT at 783.[7]

PAM must show that the new pasta line constitutes a "new production facility" under § 1677b(f)(1)(C)(ii). A foreign producer may qualify for a startup adjustment if its investment was "geared toward" a new production facility. In the initial investigation, the Department sent PAM two questionnaires intended to clarify how PAM qualified for a startup adjustment. Because the first reply was not clear, the Department sent PAM a supplemental questionnaire. Based on these responses, the Department made a determination that PAM did not meet the statutory requirements for the adjustment. PAM argues that it has made a "substantial improvement to a production facility" and has created a "new production line," but it has not shown that the improvement was "geared toward" the establishment of a "new production facility" amounting to a complete retooling or a replacement of nearly all existing machinery. *Cf. Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea: Final Results of Antidumping Administrative Reviews*, 63 Fed. Reg. 13,170, 13,200 (Mar. 18, 1998) (disallowing

---

[7] The producer's argument in *Pohang* depended solely on the fact that it expended substantial investment in creating a new line, and the record showed that the new line was only an expansion of the producer's existing type of production. The *Pohang* Court rejected the argument that the producer was entitled to a startup adjustment, explaining that incurring "'considerable costs' in establishing a new line is unremarkable without a showing that the sizeable investment was geared toward the production of a new product or a new production facility." *Pohang*, 23 CIT at 783. The *Pohang* Court further found that the "new [product] line was established as part of the existing factory and increased the [producer's] overall capacity . . . as it performed functions that were the same or similar to those of other lines at the plant." *Id*. Thus, because the producer failed to provide evidence that it had built a new production facility, or that its investment was intended for such a purpose, it was denied a startup adjustment.

a startup adjustment because the foreign producer failed to demonstrate that the production line in question constituted a "new facility" or manufactured a "new product"). Therefore, PAM failed to meet the statutory requirements.

Plaintiff failed to show that it established a new production facility or made a substantial investment geared towards a new production facility. It was reasonable for Commerce to conclude that PAM's addition of machinery to its existing facility did not qualify for a startup adjustment within the meaning of § 1677b(f)(1)(C)(ii)(I).[8] Therefore, the court affirms Commerce's denial of PAM's requested startup adjustment.

B.   THE DEPARTMENT PROPERLY CALCULATED PAM'S MARGIN OF DUMPING USING THE AVERAGE-TO-TRANSACTION METHOD.

PAM challenges the Department's use of the average-to-transaction method in this case. The average-to-transaction method is described as "a comparison of the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise." 19 C.F.R. § 351.414(b)(3) (2000). PAM primarily argues that the Department ignored the plain language of the statute when it failed to calculate antidumping duties on an "entry by entry" basis pursuant to 19 U.S.C. § 1675(a)(2)(A). *Pl.'s Br.* at 9. In addition, PAM argues that Commerce should have offset positive and negative dumping margins on an invoice by invoice basis, resulting in a lower calculation of its dumping margin.[9]

---

[8] Because PAM failed to qualify for a startup adjustment according to the requirements of § 1677b(f)(1)(C)(ii)(I), the court need not determine whether Commerce properly concluded that production levels were not limited by technical factors, pursuant to § 1677b(f)(1)(C)(ii)(II).

[9] PAM's argument concerning the Department's method of calculating its dumping margin is intertwined with its zeroing argument. Zeroing is discussed below in Section C.

Section 1675(a)(2)(A) is a general provision concerning the calculation of the antidumping duty margin in administrative reviews.  PAM relies on the language which states that "[f]or the purpose of paragraph (1)(B), the administering authority shall determine – (i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry."  § 1675(a)(2)(A).  Because the provision contains the word "entry," PAM argues that this provision dictates the method employed by Commerce.[10]

Commerce counters that the statute permits the employment of its methodology in this case and it is necessary to read 19 U.S.C. § 1675(a)(2) within the context of the other sections of the statute and in conjunction with 19 C.F.R. § 351.414 in order to comprehend the full meaning of the statute.  *See Def.'s Br.* at 14; *see also Marcel Watch Co. v. United States*, 16 CIT 474, 477, 795 F. Supp. 1199, 1202 (1992) ("It is fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and in fulfilling [its] responsibility in interpreting legislation, [the court] must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy") (internal quotes and citation omitted).

---

[10] The Department defines a "transaction" as consisting of a specific line item on an invoice, rather than an entire invoice. *See Issues and Decision Memo* at 12.  PAM contends that because an import entry consists of one or multiple invoices, the best approximation of the entry is the invoice. *Pl.'s Br.* at 10-11.  In support of its definition of "entry," PAM cites 19 U.S.C. § 1484. *Pl.'s Br.* at 19.  Section 1484 is the Tariff Act provision concerning "entry of merchandise" for Customs purposes.  PAM argues that the definition of "entry" contained in § 1484 requires Commerce to treat assorted merchandise contained on a single invoice "as a single unit" for dumping calculation purposes.  In drawing on this provision for support, PAM ignores the distinction between "entry" for purposes of Customs duties, as opposed to "entry" for purposes of the Department's antidumping duty calculation methodology. *See Def.-Int.'s Br.* at 15-16.

The statute expressly states that in a review, "when comparing export prices (or constructed export prices) of individual *transactions*," the Department will use "the calendar month of the individual export sale" as a base. § 1677f-1(d)(2) (emphasis added). Moreover, this Court has repeatedly upheld the Department's use of the "average-to-transaction" method in administrative reviews. *See Ad Hoc Comm. of S. Calif. Producers of Gray Portland Cement v. United States*, 19 CIT 1398, 914 F. Supp. 535 (1995); *NSK Ltd. v. United States*, 17 CIT 590, 825 F. Supp. 315 (1993); *Am. Silicon Technologies v. United States*, 23 CIT 237, 240-41 (1999). PAM argues that in prior cases where the use of "sales" as opposed to "entries" was endorsed in dumping margin calculations, the calculation used the "constructed export price" ("CEP") as opposed to "export price" ("EP"). *See, e.g., NSK Ltd. v. United States*, 17 CIT 590 (1993). This argument, however, was properly rejected by this Court in *American Silicon*:

> The problem with plaintiffs' argument is that if the Court were to require an entries-based methodology based upon the "plain language" of § 1675(a)(2)(A), Commerce would subsequently be required to utilize an entries-based approach not only for EP transactions, but also CEP transactions. Under a plain language reading of § 1675(a)(2)(A), the term "entry" appears to apply equally and without distinction to both CEP and EP transactions. Any ruling by this Court as to the meaning of the term "entry," as set forth in § 1675(a)(2)(A), would, therefore, also apply equally and without distinction to both CEP and EP margin calculations.
>
> The parties agree that it is oftentimes impossible for Commerce to tie sales to entries for CEP transactions. If Commerce were required to limit its § 1675(a)(2)(A) margin analysis solely to entries made during the POR, Commerce would then be presented with two options, either attempt to perform the impossible or cease calculating dumping margins for CEP transactions. Either result would significantly impede Commerce's ability to effectively enforce the antidumping law and could not have been intended by Congress. Therefore, the Court finds that once § 1675(a)(2)(A) is read in the context of the antidumping law as a whole, it becomes apparent that Commerce is not limited to entries made during the period of review when calculating dumping margins.

*American Silicon*, 23 CIT at 240.

In addition, PAM's reliance on the term "entry" in the statue is ill-founded because there is a specific regulation which enumerates the methods Commerce may employ in determining the antidumping duty margin, namely § 351.414. "In a[n administrative] review, the [Department] normally will use the average-to-transaction method" in calculating the antidumping duty margin. § 351.414(c)(2). Further, the SAA describes the average-to-transaction method as "the preferred methodology in reviews." SAA at 843. Since it is an administrative review (as opposed to an initial investigation) that is under review here, Commerce was within its discretion to employ the average-to-transaction method in this case.

The use of the average-to-transaction method in administrative reviews is in conformity with the statute, the SAA, and the Department's regulations. Therefore, the court sustains the use of the method in PAM's case.

C.     THE DEPARTMENT DID NOT ERR IN USING "ZEROING" WHEN CALCULATING PAM'S DUMPING MARGIN.

PAM challenges Commerce's methodology for calculating its weighted average dumping margin, a practice referred to as "zeroing." In zeroing, Commerce calculates the dumping margin by assigning a zero value to all sales where the U.S. price exceeds NV, thus effectively excluding all non-dumped sales or sales with "negative" margins. At the same time, Commerce includes the value of dumped sales in the dumping margin, which are therefore referred to as sales with a "positive" margin. Commerce next determines the percentage of the weighted average dumping margin "by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or

producer." 19 U.S.C. § 1677(35)(B).  Thus, while the sales with negative margins are excluded in the numerator of this formula, they are nevertheless taken into account in the denominator.[11]

Here, PAM's main argument is that if positive margins were "offset" with negative margins, the result would have been a lower overall dumping margin.  *See Pl.'s Br.* at 11.  PAM asserts that the Department should calculate a "net" dumping margin, rather than disregarding negative margins or non-dumped sales – a methodology that would produce a more accurate result.

Commerce's zeroing methodology in its calculation of dumping margins is grounded in long-standing practice.  *See, e.g., Timken Co. v. United States,* 26 CIT ___, 240 F. Supp. 2d 1228 (2002); *Bowe Passat Reinigungs-Und Waschereitechnik GMBH v. United States*, 20 CIT 558, 570, 926 F. Supp. 1138, 1149-50 (1996); *Serampore Indus. Pvt. Ltd. v. United States*, 11 CIT 866, 873-74, 675 F. Supp. 1354, 1360 (1987).[12]  Commerce justifies its position by arguing that if Congress intended that negative margins be offset by positive margins, "the statute would require Commerce to calculate a 'net' dumping margin, rather than 'aggregate' individual 'dumping margins.'" *Def.'s Br.* at 21.  Commerce explains that the statutory basis for its zeroing methodology is found in § 1677(35)(A) and (B), and when taken together, direct Commerce to aggregate all individual dumping margins and to divide this amount by the value of all sales.  The statute defines the dumping margin as "the amount by which the normal value *exceeds* the export price or constructed export price of the subject merchandise." § 1677(35)(A) (emphasis added).

---

[11] PAM had sales with both negative and positive margins in the POR.

[12] The court notes that some of the cited cases upholding zeroing precede the World Trade Organization ("WTO") Anti-Dumping ("AD") Agreement, effective as of January 1, 1995.

On the other hand, a "'weighted average dumping margin' is the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." § 1677(35)(B). Commerce interprets these provisions to permit the inclusion of only positive margins in the calculation of the aggregate dumping margin. *Def.'s Br.* at 20. "Where normal value fails to exceed the export price or constructed export price," Commerce assigns no dumping margin because there is "no dumping." *Id.*; *see also* 19 U.S.C. § 1677(34) (defining "dumping" as "the sale or likely sale of goods at less than fair value").

In determining whether Commerce's interpretation and application of the antidumping statute are in accordance with law, the applicable standard of review is prescribed by *Chevron*. The first step is to investigate as a matter of law "whether Congress's purpose and intent on the question at issue is judicially ascertainable." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998) (citing *Chevron*, 467 U.S. at 842-43). If the Court determines that the statute is silent or ambiguous with respect to the issue, the Court proceeds to the second step. *See Chevron*, 467 U.S. at 843. This is essentially an inquiry into the reasonableness of the Department's decisions, and, accordingly, the Court sustains Commerce's reasonable interpretations of the statute. *See Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). "In determining whether Commerce's interpretation is reasonable, the Court considers, among other factors, the express terms of the provisions at issue, the objectives of those provisions[,] and the objectives of the antidumping scheme as a whole." *Mitsubishi Heavy Indus., Inc. v. United States*, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

"The statute is silent on the question of zeroing negative dumping margins." *Bowe*

*Passat*, 20 CIT at 572, 926 F. Supp. at 1150.  This gap or ambiguity in the statute requires the application of the *Chevron* step-two analysis and compels this court to inquire whether Commerce's methodology of zeroing in calculating dumping margins is a reasonable interpretation of the statute.

The underlying purpose for the practice of zeroing is articulated in *Serampore Industries*. The *Serampore* Court found that Commerce, in applying a zeroing methodology, had interpreted the statute "in such a way as to prevent a foreign producer from masking its dumping with more profitable sales."  11 CIT at 874, 675 F. Supp. at 1360-61.  By offsetting positive and negative margins into a net margin, foreign producers could undermine U.S. law by strategically dumping merchandise in the United States.  For instance, companies could purposefully dump but escape antidumping duties by setting the prices of their other sales to a level such that they offset the margin, thus averaging out the margins to a level of no dumping.  *Def.'s Br.* at 21 n.8.

Section 1677(35)(A) of the statute states that dumping occurs when NV exceeds the export price and does not refer to a "net" margin.  An "aggregate dumping margin" is therefore reasonably interpreted to refer to the sum of margins of only the dumped sales.  In addition, section 1677(35)(B) specifies that the aggregate dumping margin is divided by "aggregate export prices," including the prices of all sales.  Accordingly, Commerce's exercise of including only dumped sales in the aggregate while including all sales in the division does conform to the statute and cannot be pronounced an unreasonable interpretation of the statute.

PAM next argues that because the World Trade Organization ("WTO") Appellate Body has ruled against the EC's practice of zeroing, Commerce's zeroing methodology is inconsistent

with the United States' international obligations.[13]  *Pl.'s Br.* at 11.  In *European Communities –*

*Antidumping Duties on Imports of Cotton-Type Bed Linen from India*, WT/DS141/AB/R (Mar. 1,

2001) ("*Bed Linen*"), the WTO Appellate Body ruled that the zeroing methodology employed by

the EC was inconsistent with the Article 2.4.2 of the WTO Anti-Dumping ("AD") Agreement

because it did not take into account the entirety of prices of those export transactions where

negative margins were found, resulting in inflated calculations of dumping margins.  Commerce

counters that the WTO decision does not affect the Department's zeroing methodology because

that case involved a dispute between India and the EC and did not comment on U.S. practice.

*Def.'s Br.* at 22.  Although the exact mathematical method of the EC zeroing is not available, the

fundamental practice of zeroing, as summarized in the WTO decision, is similar to the U.S.

practice.[14]  The fact that the U.S. submitted third party briefs to the WTO litigation in support of

the EC's zeroing methodology also lends credence to the argument that the two practices are

comparable.[15]  Despite these similarities, *Bed Linen* is not a basis for striking the Department's

---

[13] Commerce and the Defendant-Intervenor argue that PAM does not have standing under 19 U.S.C. § 3512(c) to introduce WTO cases in support of its argument that the Department's methodology is inconsistent with its international obligations.  *Def.'s Br.* at 22; *Def.-Int.'s Br.* at 19.  Commerce's argument is identical to the one rejected by the *Timken* court.  "[T]he Department's reliance on § 3512(c) is an erroneous technical bar."  *Timken Co. v. United States*, 26 CIT __, __, 240 F. Supp. 2d 1228, 1238 (2002) (citations and quotation omitted).  Commerce claims that the *Timken* court misapplied § 3512(c) by allowing the plaintiff Timken to cite the WTO AD Agreement in support of its private cause of action.  The court also notes that PAM advances the WTO *Bed Linen* decision as a persuasive source, rather than as a binding precedent.  Therefore, the court may properly consider it.

[14] The Court notes that the U.S. practice of zeroing is currently being challenged by Mexico pursuant to the WTO rules of dispute settlement, although a panel has not yet been established (as of the date of this opinion).

[15] The WTO Dispute Settlement Understanding ("DSU") defines a "third party" as "[a]ny Member having a substantial interest in a matter before a panel and having notified its interest to

zeroing methodology. *See Corus Staal BV v. United States*, slip op. 03-25 at 18, 27 CIT __, __ (2003). WTO panel and appellate decisions are non-binding on third parties and do not serve as precedent before this Court. *See, e.g., Hyundai Elec. Co. v. United States*, 23 CIT 302, 311, 53 F. Supp. 2d 1334, 1343 (1999); SAA at 1032 ("Reports issued by panels or the Appellate Body under the [WTO Dispute Settlement Understanding] have no binding effect under the law of the United States."); *see also Corus*, slip op. 03-25 at 18 (observing that WTO decisions have no *stare decisis* effect in the zeroing issue also being litigated here) (citation omitted). However, the reasoning of such decisions may help to inform the court's decision. *Hyundai*, 23 CIT at 311, 53 F. Supp. 2d at 1343.

Moreover, "[i]t has also been observed that an act of [C]ongress ought never to be construed to violate the law of nations, if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804) (articulating the well-known Charming Betsy doctrine); *see also* Restatement (Third) of Foreign Relations Law of the United States § 114 (1987) (recommending enjoinment of violations of international law "[w]here fairly possible."). As stated in *Timken*, this court "must determine if the Department's interpretation is reasonable, as informed by *Chevron* step-two and *Charming Betsy*." *Timken*, 240 F. Supp. 2d at 1240. In addition, the Supreme Court has held that *Chevron* is not absolute and may yield to other rules of interpretation. "Where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg.*, 485 U.S. 568, 575 (1988) (citing *NLRB v. Catholic Bishop of Chicago*,

the [Dispute Settlement Body]." Article 10.2 of the WTO DSU.

440 U.S. 490, 499-501 (1979)).

The *Bed Linen* panel did in fact find that the EC should have included the negative margins or non-dumped sales in the aggregation of dumping margins (in the numerator of the formula). *Bed Linen* at 16. Therefore, *Bed Linen* may fairly be said to call into question Commerce's methodology which excludes such margins. However, the *Bed Linen* decision was only one interpretation of the WTO AD Agreement and its precedential application is restricted to the facts and parties involved in that case.

The WTO AD Agreement on its face does not preclude Commerce's interpretation of the U.S. law. In particular, the WTO AD Agreement does not explicitly prohibit zeroing, and, indeed, does not even use the term zeroing. Article 2.4.2 of the Agreement requires that the calculation of the dumping margins be based upon "a comparison of a weighted average normal value with a weighted average of prices of *all* comparable export transactions." Article 2.4.2 of the WTO AD Agreement (emphasis added). Consistent with this mandate, in calculating the weighted average, the Department in fact divides aggregate margins (of only dumped sales) by all sales (including both the dumped and non-dumped sales). *See* § 1677(35)(A) & (B). Since the zeroing methodology employed by Commerce is not in such direct contradiction with an international obligation of the United States, the application of the Charming Betsy Doctrine to the facts of this case is not warranted. *Cf*. Jane A. Restani & Ira Bloom, *Interpreting International Trade Statutes: Is the Charming Betsy Sinking?*, 24 Fordham Int'l L.J. 1533, 1545 (2001) (arguing that faced with an ambiguous statutory provision and contrary WTO decision, the agency's decision may nevertheless be entitled to *Chevron* deference when the agency considered the WTO decision and the agency decision developed with attendant due process

safeguards).  The court's task is limited to evaluating Commerce's interpretations of the statute on the basis of reasonableness.  Therefore, under the facts of this case the court continues to uphold the Department's zeroing methodology, finding it reasonable.

**D.**     **THE DEPARTMENT DID NOT ERR IN MERGING PASTA SHAPES IN PAM'S CASE.**

This issue has carried over from a previous administrative review of pasta from Italy.  PAM challenged Commerce's classification of pasta shapes in *Prodotti Alimentari Meridionali, S.r.l. v. United States*, slip op. 02-68, 26 CIT __, __ (July 16, 2002) ("*PAM I*").  Subsequently, Commerce voluntarily remanded on the classification issue.  PAM brought the present suit before the Court ruled on the remand.  Recently, the Court upheld Commerce's remand determination that affirmed its earlier findings.  *See Prodotti Alimentari Meridionali, S.r.l. v. United States*, slip op. 03-37, 27 CIT __, __ (April 1, 2003) ("*PAM II*").

PAM's sole argument here is that "the [*PAM II*] decision . . . should control in this matter and that when [the Court] properly holds that shape categories 5 and 7 should have been merged in the third review, [] this court should also order the Department [to] do so in this matter."  *Pl.'s Br.* at 13.  However, the *PAM II* did not hold that shape categories 5 and 7 should have been merged, instead it found "no inherent error in Commerce's model match methodology, a methodology developed with the parties and used from the outset of the investigation."  *PAM II* at 5.  *PAM II* articulated that "a methodology seeking to compare pasta products based upon shape, ingredients used, and method of production is a reasonable one" despite the fact that they may be "produced on the same machines at similar speeds" and "used in a similar manner."  *Id.* PAM makes no argument and points to no fact that would help this court to distinguish *PAM II*.

On the contrary, PAM urges this court to follow *PAM II*.   Since this court in its independent judgment finds no reason to depart from *PAM II*, Commerce's decision not to merge PAM's pasta shape categories 5 and 7 in this review is accordingly sustained.

## IV. CONCLUSION

For all the foregoing reasons, Plaintiff's Motion for Judgment upon an Agency Record is denied, and the United States Department of Commerce's determination in *Notice of Final Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Duty Administrative Review and Revocation of Antidumping Duty Order in Part: Certain Pasta From Italy*, 67 Fed. Reg. 300 (Jan. 3, 2002) is upheld with respect to Plaintiff's challenges.   A separate order will be entered accordingly.

Dated: _____                                  _____
        New York, NY                                          Judith M. Barzilay
                                                              Judge