Slip Op. 04-105

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| NSK LTD. and NSK CORPORATION, <u>et al</u>., | : | |
| Plaintiffs, | : | |
| v. | : | |
| UNITED STATES, | : | |
| Defendant, | : | Before: WALLACH, Judge |
| | : | Consol. Court No.: 02-00627 |
| and | : | |
| TIMKEN U.S. CORP, | : | **PUBLIC VERSION** |
| Defendant-Intervenors. | : | |

[United States Department of Commerce's Final Results are affirmed in part and remanded in part.]

Dated: August 20, 2004

<u>Riggle and Craven</u>, (<u>David A. Riggle</u> and <u>David J. Craven</u>) for Plaintiff and Defendant-Intervenor Asahi Seiko Co., Ltd.

<u>Wilkie Farr & Gallagher</u>, (<u>Kenneth J. Pierce</u>, <u>Miriam A. Bishop</u>, and <u>Robert E. DeFrancesco</u>) for Plaintiff and Defendant-Intervenor Isuzu Motors, Ltd.

<u>Stewart and Stewart</u>, (<u>Terence P. Stewart</u>, <u>William A. Fennell</u>, and <u>Lane S. Hurewitz</u>) for Plaintiffs and Defendant-Intervenors MPB Corp. and Timken U.S. Corp.[1], respectively.

---

[1] During the July 7, 2004, oral argument, counsel for Timken U.S. Corp. clarified that Timken had bought the Torrington Company, the Defendant-Intervenor during the administrative proceedings, and that the two companies were "now one and the same." Torrington and Timken are thus used interchangeably throughout the Slip Op., depending on the timing of the document cited or argument made.

Crowell & Moring, LLP, (Matthew Philip Jaffe, Robert A. Lipstein, and Grace Lawson) for Plaintiffs and Defendant-Intervenors NSK Corp., NSK Ltd., NSK Bearings Europe, Ltd.

Barnes, Richardson & Colburn, (Donald J. Unger and Kazumune V. Kano) for Plaintiffs and Defendant-Intervenors NTN Corp., NTN Bearing Corp. Of America, American NTN Bearing Manufacturing Corp., NTN Driveshaft, Inc., and NTN-BCA Corp.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; Paul D. Kovac, Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; and Peter G. Kirchgraber, Philip Curtin, Elizabeth Doyle, Marisa Goldstein, Peter Kaldes, Barbara Tsai, Attorney Advisors, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant United States.

**OPINION**

**Wallach, Judge:**

**I**
**INTRODUCTION**

In this action, Plaintiffs NSK Ltd., NSK Corp., (collectively "NSK Japan"); NSK Bearings Europe, NSK Corp., (collectively, "NSK Europe"); NTN Corp., NTN Bearing Corp. of America, American NTN Bearing Manufacturing Corp., NTN Driveshaft, NTN-BCA Corp., (collectively, "NTN"); MPB Corp. ("MPB"); Asahi Seiko Co. ("Asahi"); and Isuzu Motors, Ltd. ("Isuzu") challenge the final results of an administrative review issued by the United States Department of Commerce ("Commerce") with respect to Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom; Final Results of Antidumping Administrative Reviews, 67 Fed. Reg. 55,780 (Aug. 30, 2002) ("Final Results"). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2002). For the following reasons, Commerce's determination is affirmed in part and remanded in part.

## II
## BACKGROUND

On May 15, 1989, the Department published in the Federal Register the antidumping duty orders on ball bearings ("BBs") and parts thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom and on spherical plain bearings and parts thereof from France. Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand, 54 Fed. Reg. 20,909 (May 15, 1989) ("Original Investigation"). On June 19, 2001, Commerce published a notice of initiation of the twelfth administrative review of these orders, covering a period of review ("POR") of May 1, 2000, through April 30, 2001, for the subject Japanese BBs. Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocations in Part, 66 Fed. Reg. 32,934 (June 19, 2001) ("Initiation of Twelfth Administrative Review").

Commerce published the preliminary results in this administrative review in Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and The United Kingdom: Preliminary Results of Antidumping Duty Administrative Reviews and Partial Rescission of Administrative Reviews, 67 Fed. Reg. 17,361 (April 10, 2002) ("Preliminary Results"). Commerce issued the Final Results on August 30, 2002. The scope of this order covers ball bearings, mounted or unmounted, and parts thereof, including all antifriction bearings that employ balls as the rolling element. Final Results, 67 Fed. Reg at 55,780. Products that fall under these parameters include antifriction balls, BBs with integral shafts, BBs (including radial BBs) and parts, and housed or mounted BB units and parts.[2]

---

[2] These products are classified under the following subheadings in the Harmonized Tariff Schedule of the United States (HTSUS):

Id. In the Final Results, Commerce found a 6.07% weighted-average margin for NSK Japan, 16.87% for NSK Europe, 9.72% for NTN, 2.51% for Asahi, and 73.55% for Isuzu. See id. at 55,781.

## III
## PARTIES' ARGUMENTS

Asahi, NSK Europe, and NSK Japan challenge Commerce's decision to assign a zero margin to sales above normal value when calculating the weighted average dumping margin. Commerce and Timken argue that Commerce's methodology is supported by substantial evidence and is in accordance with law.

Asahi claims that, because service was made to it after the regulatory deadline by Torrington, Commerce improperly initiated its administrative review. Commerce and Torrington posit that Commerce conducted the administrative review of Asahi in accordance with law.

Asahi disputes Commerce's use of model-specific methodology to conduct its below-cost test. Commerce and Torrington argue that its methodology is supported by substantial evidence and is in accordance with law.

---

3926.90.45, 4016.93.00, 4016.93.10, 4016.93.50, 6909.19.5010, 8431.20.00, 8431.39.0010, 8482.10.10, 8482.10.50, 8482.80.00, 8482.91.00, 8482.99.05, 8482.99.2580, 8482.99.35, 8482.99.6595, 8483.20.40, 8483.20.80, 8483.50.8040, 8483.50.90, 8483.90.20, 8483.90.30, 8483.90.70, 8708.50.50, 8708.60.50, 8708.60.80, 8708.70.6060, 8708.70.8050, 8708.93.30, 8708.93.5000, 8708.93.6000, 8708.93.75, 8708.99.06, 8708.99.31, 8708.99.4960, 8708.99.50, 8708.99.5800, 8708.99.8080, 8803.10.00, 8803.20.00, 8803.30.00, 8803.90.30, and 8803.90.90.

Final Results, 67 Fed. Reg at 55,780.

Commerce and Timken argue that Isuzu did not exhaust its administrative remedies and thus is now precluded from relying upon certain proprietary information to support its corroboration argument. Isuzu claims, on the contrary, that the Government waived the exhaustion argument by consenting to its access to information protected under the Judicial Protective Order in this case.

Isuzu challenges Commerce's adverse facts available determination, applying the highest calculated rate and corroborating it with contemporaneous sales, after Isuzu did not cooperate in this review. Commerce and Timken argue that Commerce's choice of adverse facts available rate is supported by substantial evidence and is in accordance with law.

MPB claims that Commerce's determination to accept NTN's reported cost data is erroneous. NTN argues that it reported its cost data accurately and Commerce agrees that NTN responded adequately to the questionnaires.

NSK Europe states that Commerce improperly interpreted "foreign like product" for calculating constructed value. Commerce and Timken say that the Federal Circuit has affirmed Commerce's interpretation.

NTN argues that Commerce incorrectly applied adverse facts available in calculating its home-market and U.S. freight expenses. Commerce, MPB, and Timken state that Commerce's methodology is supported by substantial evidence and is in accordance with law.

NTN challenges Commerce's treatment of inputs that NTN obtained from affiliated suppliers in calculating cost of production and constructed value. Commerce, Torrington, and Timken argue that Commerce's determination is supported by substantial evidence and is in

accordance with law.[3]

NTN points out that there were clerical errors in the amended final results computer program that affected the accuracy of NTN's dumping margin. Commerce agrees and requests a remand to exclude export price sales from NTN's U.S. freight and warehouse expense calculations.

**IV**
**STANDARD OF REVIEW**

This court will uphold an administrative antidumping determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. 1516a(b)(1)(B) (2002); SKF United States v. INA Walzlager Schaeffler KG, 180 F.3d 1370, 1374 (Fed. Cir.1999). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion." Aimcor, Alabama Silicon, Inc. v. United States, 154 F.3d 1375, 1378 (Fed. Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 16 L. Ed. 2d 131, 86 S. Ct. 1018 (1966). It is not the court's duty to "weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and

---

[3] During the July 7, 2004, oral argument, counsel for NTN stated that pursuant to NTN Corp. v. United States, 306 F. Supp.2d 1319 (CIT 2004), NTN was "abandoning" its claim challenging Commerce's determination to use the highest transfer price, cost of production, or market value to value the major inputs NTN purchased from its affiliated supplier. Accordingly, the issue is moot.

applying the statute." Suramericana de Aleaciones Laminadas v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992).

In examining an agency's interpretation of a statute, this court is confronted with two questions. Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). First, the court must consider if "Congress has directly spoken to the precise question at issue." Id. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. If Congress has not spoken directly on the issue, this court cannot simply impose its own construction of the statute, but instead looks at whether the agency's interpretation "is based on a permissible construction of the statute." Id. at 843. "[I]t is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Fed. Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39 (1981). A court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another. Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S. Ct. 2441, 57 L. Ed. 2d 337 (1978).

**V**
**ANALYSIS**

**A**
**Commerce's Decision to Assign a Zero Margin to Sales Above Normal Value in Calculating the Dumping Margin Is Supported by Substantial Evidence and Is In accordance with Law**
**1**
**Commerce's Decision to Assign a Zero Margin is In Accordance with U.S. Statute**

Asahi, NSK Japan, and NSK Europe challenge Commerce's assignment of a zero margin

to export price ("EP") or constructed export price ("CEP") sales made above normal value ("NV"). While conceding that this court has upheld Commerce's methodology previously, NSK Japan and NSK Europe argue that the "methodology so biases antidumping calculations that the presence of a single U.S. sale below normal value can produce a dumping margin, even though there exists hundreds of sales for which the opposite is true." NSK Ltd. & NSK Corp. Motion for Judgment on the Agency Record ("NSK Japan's Motion") at 6; NSK Bearings Europe Ltd. & NSK Corp's Motion for Judgment on the Agency Record ("NSK Europe's Motion") at 7. NSK Japan and NSK Europe claim that the definition of dumping in 19 U.S.C. § 1677(35)(A)[4] "reaffirms that dumping only exists when normal value exceeds export price or constructed export price *of the subject merchandise*," thus reiterating that the "focal point of any antidumping inquiry is the class of merchandise." NSK Japan's Motion at 7 (emphasis in original); NSK Europe's Motion at 8-9 (emphasis in original). NSK Japan argues that Commerce calculated a 6.07% dumping margin on BBs while over 85% of its U.S. sales exceeded NV and that the overall margin for BBs class of merchandise was (-18.78%). NSK Japan's Motion at 11. NSK Europe similarly argues that Commerce calculated a 16.87% margin on BBs though over one-half of its sales exceeded NV and the overall margin for BBs was (-7.93%). NSK Europe's Motion at 12-13.

Commerce argues that U.S. antidumping law directs the agency to assign a zero value to sales where the U.S. price, the EP or CEP, exceeds NV. Defendant's Response in Partial

---

[4] The statute, 19 U.S.C. § 1677(35)(A), states: "[t]he term 'dumping margin' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."

8

Opposition to the Motions for Judgment upon the Agency Record Filed by Asahi Seiko, Isuzu, MPB, NSK Europe, NSK Japan, and NTN ("Defendant's Response") at 12. Commerce states that

> [t]his effectively excludes "all non-dumped sales or sales with 'negative' margins." PAM, S.p.A. v. United States, slip op. 03-48 at *6 (CIT May 8, 2003). "At the same time, Commerce includes the value of dumped sales in the dumping margin, which are therefore referred to as sales with a 'positive' margin." Id. The percentage of the weighted average dumping margins determined for a specific exported or producer by the aggregate export prices and constructed export prices of such exporter or producer." 19 U.S.C. § 1677 (35)(B). In the Final Results, Commerce applied this methodology and assigned a zero value for Asahi, NSK Europe, and NSK Japan. Decision Memo at Comment 3, P. App. at Tab 2.

Id. at 11. To support its arguments, Commerce first asserts that the plain language of the statute requires it to focus on sales prices "below" fair value. For, 19 U.S.C. § 1677(35)(A) defines dumping as the "amount by which the [NV] exceeds the [EP] or [CEP] of the subject merchandise." Id. at 12 (emphasis in original). Second, "weighted average dumping margin" is defined as "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." 19 U.S.C. § 1677(35)(B). This, Commerce argues, leads to the conclusion that the statute directs Commerce to aggregate entries when the NV exceeds the U.S. price in determining the "weighted-average dumping margin." Commerce claims that this methodology does not ignore the non-dumped sales because

> [t]his does not mean, however, that we ignore sales that were not priced below normal value in calculating the weighted-average rate. It is important to recognize that the weighted-average margin will reflect any "non-dumped" merchandise examined during an investigation or review because the value of such sales is included in the denominator of the weighted-average dumping margin calculation while no dumping amount for "non-dumped" merchandise is included in the numerator. Thus, a greater amount of "non-dumped" merchandise results in a

9

lower weighted-average margin.

Issues and Decision Memorandum for the Administrative Reviews of Ball Bearings (other than tapered roller bearings) and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom – May 1, 2000, through April 30, 2001, A-100-001, from Richard W. Moreland, Deputy Assistant Secretary for Import Administration, to Faryar Shirzad, Assistant Secretary for Import Administration (August 3, 2002) ("Issues and Decision Memorandum") at 13; Defendant's Response at 14.  Moreover, Commerce cites that its methodology is reasonable and that a number of cases from this court have upheld its weighted-average dumping methodology. It argues that if it were to offset the dumping margins with sales greater than NV, there would be a canceling out of margins which would in turn permit the selective use of dumping. Defendant's Response at 16.

The Defendant-Intervenor Timken supports Commerce's use of zeroing methodology.  It claims that U.S. law requires zeroing, as "dumping margin" is defined as the amount by which NV "exceeds" EP or CEP and a "weighted dumping margin is the sum of 'dumping' margins,'" not the sum of dumping margins and the amounts by which export or constructed export prices exceed normal value." Response of Timken U.S. Corporation, Defendant-Intervenor, to the Rule 56.2 Motions of Asahi Seiko Co., Ltd., et al. ("Timken's Response") at 22.  Timken argues that the history of antidumping duty administration, since the Antidumping Duty Act of 1921, shows that U.S. authority has computed dumping margins on an entry-by-entry basis and has even responded in the negative for requests of including negative margins in its regulations.  Id. at 23 (citing U.S. Administration of the Antidumping Act of 1921, Report by the Comptroller General to the Congress of the United States at 33, ID-79-15 (Mar. 15, 1979) and Antidumping and

10

Countervailing Duties; De Minimis Dumping Margins and De Minimis Subsidies, 52 Fed. Reg. 30,660, 30,662 (Aug. 17, 1987) concerning 19 C.F.R. § 353.24(b)(1989)). Timken further argues that neither the legislative history of the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994), nor the URAA, Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-826, at 822 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, set out changes to Commerce's zeroing methodology. See Timken's Response at 27. Timken states that in the URAA the "crafters of the law intended to implement the requirements for fair comparison as they understood them: by defining what prices were to be used and how they were to be adjusted to determine normal value." Id. at 28. Thus, Timken finds Commerce's interpretation of 19 U.S.C. § 1675(a)(2)(A) to be reasonable.

Commerce's zeroing methodology has been upheld by this court and the Federal Circuit as reasonable on many previous occasions. See Timken Co. v. United States, 354 F.3d 1334, 1340-45 (Fed. Cir. 2004); PAM, S.p.A. v. United States, 265 F. Supp. 2d 1362, 1370 (CIT 2003); Corus Staal BV v. United States 259 F. Supp. 2d 1253, 1260-65 (CIT 2003); Timken Co. v. United States, 240 F. Supp. 2d 1228 (CIT 2002); Bowe Passat Reinigungs-Und Waschereitechnik GMBH v. United States, 20 CIT 558, 570 (1996); Serampore Indus. Pvt. Ltd. v. United States, 11 CIT 866, 873-74 (1987). Because, however, the "statute is silent on the question of zeroing negative dumping margins," see Bowe Passat, 20 CIT at 572, see also Timken, 354 F.3d at 1341-42, in determining whether Commerce's interpretation is in accordance with the law, this court applies the Chevron standard. See also Corus Staal BV, 259 F. Supp. 2d at 1261. This inquiry examines whether Commerce's interpretation of the statute is reasonable and sustains the interpretations if the answer is in the affirmative. See PAM, S.p.A.,

265 F. Supp. 2d at 1371; Fujtsu Gen. Ltd. v. United States, 88 F. 3d 1034, 1038 (Fed. Cir. 1996).

Commerce and Timken justify the use of zeroing, pointing out that 19 U.S.C. 1677(35)(A) defines a dumping margin as the amount by which NV "*exceeds*" EP or CEP; and, the dictionary definition of "exceeds" is "[t]o be greater than; surpass." The American Heritage Dictionary of the English Language 638 (3d ed. 1996).  Addressing this issue, the Federal Circuit in Timken, 354 F.3d at 1342, stated that

> while the statutory definitions do not unambiguously preclude the existence of negative dumping margins, they do at a minimum allow for Commerce's construction.  Basically, one number "exceeds" another if it is "greater than" the other, meaning it falls to the right of it on the number line.  Here, because Commerce's zeroing practice is a reasonable interpretation of the statutory language, we do not question it in light of other reasonable possibilities.

Furthermore, "weighted average dumping margin," as defined in 19 U.S.C. § 1677 (35)(B), requires Commerce to take the aggregate dumping margin and divide it by the aggregate export prices, which include all prices of *all* sales. PAM, S.p.A., 265 F. Supp. 2d at 1371.  In considering the policy backdrop to the statute, Commerce also convincingly points out that offsetting dumping margins with sales greater than NV would allow foreign companies to practice selective dumping. See Timken, 354 F.3d at 1342-43.  Thus, zeroing prevents foreign producers from "masking [their] dumping with more profitable sales." Serampore Indus., 11 CIT at 874; see Timken, 354 F.3d at 1343.  Accordingly, Commerce's interpretation of the U.S. statute, using dumped sales in the aggregate and dividing these by all sales, including nondumped sales, is a reasonable interpretation of the statute. See PAM, S.p.A., 265 F. Supp. 2d at 1371.

12

**2
Commerce's Decision to Assign a Zero Margin is In Accordance
with U.S. WTO Obligations**

Asahi, NSK Japan, and NSK Europe claim that, in employing zeroing methodology, Commerce has interpreted and applied the U.S. statute in a WTO-inconsistent manner. Asahi argues that Article 2.4.2 of the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 ("AD Agreement") "require[s] a fair comparison of margins, and zeroing violates this precept." Motion of Asahi Seiko Co. Ltd. for Judgment on the Agency Record Pursuant to Rule 56.2 ("Asahi's Motion") at 9. Asahi, NSK Japan and NSK Europe argue that the WTO Panel Report in European Communities - Antidumping Duties on Imports of Cotton-Type Bed Linen from India, WT/DS/141/AB/R (Mar. 1, 2001) ("EC - Bed Linen"), which deemed the EC's zeroing methodology to be WTO-inconsistent, supports its argument that Commerce's zeroing methodology is WTO inconsistent.[5] NSK Japan and NSK Europe also point out that the WTO Panel's decision in United States-Anti-Dumping Measures on Certain Hot-Rolled Steel Products from Japan, WT/DS184/R (Feb. 28, 2001), in which it determined that the arm's length test failed to give equal weight to affiliated transactions that occurred above and below prices of unaffiliated transactions, underscores the idea that the "antidumping law's 'fair comparison' requirements are not met when there is an identifiable bias

---

[5] NSK Japan says that "NSK Japan rests its case on U.S. antidumping law. Our discussion of the WTO Panel decisions serves only to demonstrate that international legal authorities concur that NSK Japan is right and Commerce is wrong." NSK Japan's Motion at 7 n. 19. NSK Europe similarly states "NSK Europe rests its case on U.S. antidumping law. Our discussion of the WTO Panel decisions serves only to demonstrate that international legal authorities concur that NSK Japan is right and Commerce is wrong." NSK Europe's Motion at 9 n. 22.

in the methodology employed." NSK Japan's Motion at 9; NSK Europe's Motion at 11.

Commerce argues that the WTO AD Agreement and the Appellate Body decision in EC – Bed Linen "have no effect upon this proceeding, which is governed by United States statutory law." Defendant's Response at 18-19. Furthermore, Commerce challenges Plaintiffs' ability to bring this WTO consistency claim for want of standing. It claims that allowing Plaintiffs to bring such a claim frustrates the explicit intent of Congress in U.S. statute and the SAA. If Plaintiffs have standing to bring a WTO claim, Commerce argues that Article 2.4.2 of the AD Agreement do not apply because the WTO Agreement is not self-executing. Commerce also posits that EC – Bed Linen, as a WTO Appellate Body decision, has no binding effect on the U.S. as per the SAA. As a result, Commerce asserts, its zeroing methodology does not violate U.S. obligations under international law. Defendant's Response at 22.

Timken argues that the U.S. is under no obligation to follow WTO panel and Appellate Body reports, as they are only binding on the WTO Member countries who are parties; even then, the particular member has a variety of options in terms of what actions it can take in response to a WTO ruling and U.S. law does not integrate automatically WTO rulings. See Timken's Response at 31-34. In particular, Timken argues that EC – Bed Linen does not apply to the case at hand because it deals with the computation of dumping margins during an antidumping investigation and not an administrative review. Similarly, Article 2.4.2 applies only to investigations and not reviews. Thus, Timken sees no conflict between Commerce's zeroing methodology, the WTO AD Agreement, and EC – Bed Linen. Timken's Response at 37.

14

Commerce's zeroing methodology is not WTO-inconsistent.[6] See Timken, 354 F.3d at 1344. This court considers the relationship between a U.S. statute and U.S. international obligations, because, pursuant to the Charming Betsy[7] doctrine, "it has . . . been observed that an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains." 6 U.S. at 188. The WTO AD Agreement does not explicitly prohibit the practice of zeroing, nor does it use the term "zeroing." PAM, S.p.A., 265 F. Supp. 2d at 1373; Corus Staal, 259 F. Supp. 2d at 1263. Specifically, AD Agreement Article 2.4.2. states that dumping margins should be based on a "comparison of a weighted average normal value with a weighted average of prices of all comparable export transactions . . . ." While the Plaintiffs argue that Commerce disregards the nondumped transactions through zeroing, as explained in Bowe Passat, nondumped sales are not ignored but are assigned the value of zero and combined with the dumped sales in calculating the overall margin. 20 CIT at 570-71. The negative margin sales thus have the "effect of diluting the dumping margin, making the margin lower than it would otherwise be if . . . these sales were totally disregarded and were not given any credit in the

---

[6] Commerce claims that pursuant to 19 U.S.C. § 3512(c)(1) that Plaintiffs have no standing to challenge its interpretations of U.S. statute vis-a-vis the WTO Agreements and Reports, because the statute states that "no person other than the United States . . . may challenge, in any action brought under any provision of law, any action or inaction by any agency . . . on the ground that such action or inaction is inconsistent with [the URAA]." As in Timken v. US, 240 F. Supp. 2d at 1238, the Plaintiffs Asahi, NSK Japan, and NSK Europe are "not bringing this action under any WTO agreement; rather, [they are] arguing that the Department's application and interpretation of U.S. law violates its international obligations pursuant to a WTO agreement." They are "free to argue that Congress would never have intended to violate an agreement it generally intended to implement, without expressly saying so." Gov't of Uzbekistan v. United States, Slip Op. 01-114 at 11, 2001 Ct. Int'l Trade LEXIS 113 (Aug. 30, 2001). Thus, here as in the aforementioned cases, the Department's reliance on 19 U.S.C. § 3512(c) is an "erroneous technical bar." Id.

[7] Murray v. Schooner Charming Betsy, 6 U.S. 64, 118, 2 Cranch 64, 2 L. Ed. 208 (1804).

15

analysis." Id. at 571-72. Thus, Commerce does take into account non-dumped sales and has not interpreted U.S. statute in contravention of the WTO AD Agreement by employing its zeroing methodology.[8]

Because Commerce has employed the zeroing methodology in a manner which is reasonable in light of the WTO AD Agreement, this court defers to Commerce's interpretation and application of the U.S. statute and finds it to be in accordance with law.

## B
### Commerce's Decision to Conduct Asahi's Administrative Review, though Asahi Was Not Properly Served Notification of the Review's Initiation, Is In Accordance With Law

Asahi claims that Commerce improperly initiated its administrative review of Asahi and should instead have rejected request for Asahi's review by Petitioner, Torrington Company. Issues and Decision Memorandum at 93. It argues that when Torrington requested a review of Asahi, it failed to notify Asahi of its request and that Asahi only learned of the request for review in the Initiation of Twelfth Administrative Review, 66 Fed. Reg. at 32,934. Id. at 93-94. Asahi explains that while the request for review has its correct address, the certificate of service did not show Asahi as having been served. Id. at 94. Asahi states that it immediately brought the

---

[8] Based on distinguishing facts, Commerce's zeroing methodology was found to be reasonable by the Federal Circuit in Timken, 354 F.3d at 1344, even though the WTO Appellate Body found similar zeroing methodology used by the EC to be inconsistent with the AD Agreement Article 2.4.2 in EC – Bed Linen. While WTO adjudicatory decisions may be persuasive, they are not binding on Commerce or this court. See SAA at 1032; Timken, 354 F.3d at 1344; Hyundai Elec. Co. v. United States, 23 CIT 302, 311 (1999). Indeed, they are not even binding on the WTO adjudicatory system as they do not have the *stare decisis* effect of common law. Understanding on Rules and Procedures Governing the Settlement of Disputes, Apr. 15, 1994, Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations, Legal Instruments – Results of the Uruguay Round, Annex 2, vol. 31, 33 I.L.M. 1226 (1994), Article 3(2). "WTO decisions appear to have very limited precedential value and are binding only upon the particular countries involved. They are not binding upon other signatory countries or future WTO panels." Corus Staal, 259 F. Supp. 2d at 1264.

insufficiency of service to Commerce's attention. Asahi's Motion at 11; see Letter from David

A. Riggle to Ms. Holly Kuga, U.S. Department of Commerce, Import Administration (June 20,

2001). Asahi argues that, because Torrington did not follow the requirements of 19 C.F.R.

§351.303[9] and because it cannot argue that it made a reasonable effort to serve Asahi as it did

not, Commerce should have rejected Torrington's request for review. Asahi claims that the delay

in notification burdened it as it had not been involved in the immediately preceding review and

"may have been the reason for the increase in the antidumping margin calculated in the review . .

---

[9] The relevant parts of the 19 C.F.R. § 351.303 state:

> Sec. 351.303  Filing, format, translation, service, and certification of documents.
>
> . . .
>
> (f) Service of copies on other persons. (1)(I) In general. Except as provided in § 351.202(c) (filing of petition), § 351.207(f)(1) (submission of proposed suspension agreement), and paragraph (f)(3) of this section, a person filing a document with the Department simultaneously must serve a copy of the document on all other persons on the service list by personal service or first class mail.
>
> . . .
>
> (3) Service requirements for certain documents.
>
> . . .
>
> (ii) Request for review. In addition to the certificate of service requirements under paragraph (f)(2) of this section, an interested party that files with the Department a request for an expedited antidumping review, an administrative review, a new shipper review, or a changed circumstances review must serve a copy of the request by personal service or first class mail on each exporter or producer specified in the request and on the petitioner by the end of the anniversary month or within ten days of filing the request for review, whichever is later. If the interested party that files the request is unable to locate a particular exporter or producer, or the petitioner, the Secretary may accept the request for review if the Secretary is satisfied that the party made a reasonable attempt to serve a copy of the request on such person.

17

. . At the very least it contributed to the partial Facts Available rate calculated in the preliminary results." Asahi's Motion at 14.

The Defendant-Intervenor Torrington cited <u>Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review</u>, 62 Fed. Reg. 53808 (Oct. 16, 1997) and argued that due to the shortness of the delay in receiving the review request and to the fact that Asahi had participated in six previous reviews, Commerce's determination to treat the delay as harmless was within its discretion. Issues and Decision Memorandum at 94. Timken states that Commerce was right to conclude that Torrington made a reasonable effort to correct the omission by faxing the request on June 20, 2001, thus mitigating the mistake. Timken's Response at 52. It also claims that, because Asahi participated in the review, it waived its objection to the delay. Timken asserts that this delayed service constituted harmless error, if any. <u>Id.</u> at 53.

Commerce argues that it should not have rejected Torrington's request for review of Asahi. Torrington filed its request for an administrative review on the antidumping duty orders upon BBs and parts from France, Germany, Italy, Japan, and the United Kingdom on May 31, 2001. Defendant's Response at 22; <u>See</u> Letter from Law Firm of Stewart and Stewart: Request for Administrative Review on Behalf of Petition for Period 5/1/00-4/30/01 (May 31, 2001). Though Asahi should have been served with a copy of the request by June 10, 2001, pursuant to 19 C.F.R. § 351.303, it did not receive formal notification until the publication of the Initiation of Twelfth Administrative Review on June 19, 2001. Defendant's Response at 23. Despite the delay in notification, Commerce did not issue its questionnaire until June 28, 2001 and thus "took no action to prejudice Asahi during the nine-day period which Asahi lacked notice." <u>Id.</u> at

18

25; Issues and Decision Memorandum at 94. Commerce argues that Torrington made a reasonable effort to serve Asahi with the request; because, after it realized it had made the error, it faxed Asahi a copy of the request on June 20, 2001. Issues and Decision Memorandum at 94. Commerce states that the Supreme Court has granted the judiciary as well as administrative agencies the discretion to relax and modify procedural rules if justice warrants it. Defendant's Response at 24 (citing Am. Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 539 (1970)).

Commerce claims, pursuant to Am. Farm Lines, that two criteria need to be met for a Court to require an agency to abide strictly by its regulations. First, the regulations have to confer important procedural benefits. Am. Farm Lines, 397 U.S. at 538-39. Here, 19 C.F.R. § 351.303 does not specify consequences for an untimely service of notice and, while Asahi argues that there is one exception to the service requirement, the regulation does not require Commerce to reject a request for review based on a deficient service. Second, the plaintiff must show substantial prejudice. Id. Asahi has not demonstrated substantial prejudice, because Commerce says "there is no prejudice in being denied additional time to prepare, where such additional time is not provided for or even contemplated in the statute or the regulations." Defendant's Response at 28. Commerce thus argues that it does not accept Asahi's argument that it had insufficient time to prepare for the review and "the exemption of a foreign producer (Asahi) from an administrative review based upon a minor service technicality could potentially lead to an inaccurate dumping margin and the perpetuation of injury to the domestic injury that the antidumping duty statute was designed to prevent." Id. at 25.

Commerce was within its discretion to continue the administrative review of Asahi. The regulation at issue, 19 C.F.R. § 351.303(f)(3)(ii) (2001), states that in a request for an

administrative review, the petitioner "must serve a copy of the request" to the "exporter or

producer specified . . . within ten days of filing the request for review." The regulation provides

an exception so that if the petitioner is unable to locate the exporter or producer, Commerce may

still accept the request for review if it "is satisfied that the party made a reasonable attempt to

serve a copy of the request on such person." 19 C.F.R. § 351.303(f)(3)(ii).  The regulation,

however, as Commerce points out, does not direct Commerce to rescind a review because service

was faulty and neither provides for penalties nor instructs Commerce on what it should do in

cases such as the one at hand.  See  Intercargo Ins. Co. v. United States, 83 F.3d 391, 395-96

(Fed. Cir.1996) ("if a statute does not specify a consequence for noncompliance with statutory

timing provisions, the federal courts will not in the ordinary course impose their own coercive

sanction. . . . [There] is no presumption or general rule that for every duty imposed upon the

court or the Government and its prosecutors there must exist some corollary punitive sanction for

departures or omissions, even if negligent.") (citing United States v. James Daniel Good Real

Prop., 510 U.S. 43, 63-64, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993)).

The Supreme Court in Am. Farm Lines stated that

> "it is always within the discretion of a court or an administrative agency to relax
> or modify its procedural rules adopted for the orderly transaction of business
> before it when in a given case the ends of justice require it. The action of either in
> such a case is not reviewable except upon a showing of substantial prejudice to
> the complaining party."

397 U.S. at 539 (citing NLRB v. Monsanto Chem. Co., 205 F.2d 763, 764 (8th Cir. 1953)).  The

regulatory notice requirement at issue is procedural, which is highlighted by the title of the

regulation itself: "Filing, format, translation, service, and certification of documents." The

Federal Circuit has held that Commerce's failure to comply with a regulatory notice requirement

20

did not void the agency's action or compel the court to revoke the antidumping finding. Intercargo Ins. Co., 83 F.3d at 396 (citing Kemira Fibres Oy v. United States, 61 F.3d 866 (Fed. Cir. 1995). The court's reasoning in Kemira Fibres was that the Plaintiff "should not become immune from the antidumping laws because Commerce missed the deadline. The national interest in the regulation of importation should not fall victim to an oversight by Commerce." 61 F.3d at 873.

As the regulation here was "not intended to confer important procedural benefits, . . . for Plaintiff to prevail on its procedural claims it must demonstrate that it was substantially prejudiced by Commerce's actions." Taiyuan Heavy Mach. v. United States, 23 CIT 701, 703 (1999). Asahi has not adequately shown that it was substantially prejudiced by the untimely service. Asahi had notice on June 19, 2001, from the Federal Register, that Torrington had requested its inclusion in the administrative review. See Lyng v. Payne, 476 U.S. 926, 942-43, 106 S. Ct. 2333; 90 L. Ed. 2d 921 (1986) (citing 44 U.S.C. § 1507 stating that publication in Federal Register "is sufficient to give notice of the contents of the document to a person subject to or affected by it"). June 19, 2001, was only nine days after Asahi should have been notified by Torrington pursuant to the regulation, but Commerce did not issue its questionnaires, its first request for information from the parties in the review, until June 28, 2001.

As Asahi states, it was thus deprived of being able "to begin to prepare for" the review. However, "[a] party is not 'prejudiced' by a technical defect simply because that party will lose its case if the defect is disregarded. Prejudice . . . means injury to an interest that the statute, regulation, or rule in question was designed to protect." Intercargo Ins. Co., 83 F.3d at 396. Here, nine fewer days of preparation time, prior even to the receipt of Commerce's questionnaire,

21

does not constitute such substantial prejudice that a remand is required on this issue. The public interest and domestic industry should not "fall victim" to such a procedural defect, if the oversight has not had a cognizable prejudicial impact on the Plaintiff. Id. Therefore, Commerce's determination to accept Torrington's request for the review of Asahi is in accordance with law.

**C**

**Commerce's Use of Model-Specific Methodology In Calculating Cost of Production for Asahi is Supported by Substantial Evidence and Is In Accordance With Law**

Asahi disputes Commerce's conclusion that Asahi made home market sales in substantial quantities at below the cost of production ("COP"). Referring to 19 U.S.C. § 1677(16) and Commerce's regulations in Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,412 (May 19, 1997), Asahi argue that the overall 20% below-cost determination has to be done on a foreign like product basis, as per 19 C.F.R. § 351.406, and not a model-specific basis. Issues and Decision Memorandum at 66. Because it claims that foreign like product refers to the overall product[10], not individual models, Asahi argues that the COP analysis should be based on total sales of ball bearings, those above as well as below cost. Id.; Asahi's Motion at 16-17. Asahi basis its claim of required aggregation on the distinction between the terms "foreign like product" in 19 U.S.C. § 1677(16) and 19 U.S.C. § 1677b(b) and "subject merchandise" in 19 U.S.C. § 1677b(a)(1)(A), arguing that the former term supposes a broader category beyond just the model of merchandise. Asahi further argues that because 19 U.S.C. § 1677b(b)(2)(C)(I) directs Commerce to examine whether below cost sales were made in substantial quantities, or

---

[10] Commerce determined in the Original Investigation that there were five categories which comprised the "like product": ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings, and plain bearings. 54 Fed. Reg. At 18,998.

over 20% of the total volume of sales, and this was not the case; thus, Commerce did not meet its statutory burden. Issues and Decision Memorandum at 66.

Torrington also referred to 19 U.S.C. § 1677b(b)(2)(C)(I) and argues that Commerce interprets the phrase "the volume of sales under consideration for the determination of foreign market" to refer to sales of the model it examined. Id. Torrington also argued that Commerce's interpretation of the statute conforms with its prior practice of the "10/90/10 test" in the Use and Measurement of Production Costs Under U.S. Antidumping Law at 9 (Sept. 19, 1995). Id.

Commerce states that it has a long standing policy of conducting the sales-below-cost test (know as the "10/90/10 test") on a model-specific basis. Id. at 67 (referring to Policy Bulletin, 92.3 (Dec. 15, 1992); Policy Bulletin, 94.1 (Mar. 25, 1994); SAA at 833); Defendant's Response at 31-32 (referring also to Mitsubishi Heavy Indus. v. United States, 22 CIT 541, 563 (1998)). Commerce claims that after calculating COP as per 19 U.S.C. 1677b(b)(3), it tested whether home-market sales of the foreign like product were sold at prices below the COP within an extended period of time and in substantial quantities and whether the prices permitted the recovery of all costs within a reasonable period of time. Defendant's Response at 29. Commerce states that it compared model-specific COPs to the reported home-market prices less any movement charges, discounts, and rebates. Id. Commerce argues that the court's interpretation of 19 U.S.C § 1677(16) and 19 U.S.C. § 1677b(b) require a rejection of Asahi's distinction in breadth between "foreign like product" and "subject merchandise and there is no basis for deviation from the precedent. Id. at 32, 33 (referring to NSK, Ltd. v. United States, 217 F. Supp. 2d 1291, 1299-1300 (CIT 2002) & Ausimont S.p.A. v. United States, Slip Op. 02-148 at 18 n. 6, 2002 Ct. Int'l. Trade LEXIS 154 (Dec. 17, 2002)). In accordance with 19 U.S.C. §

1677b(b)(2)(C)(I), Commerce thus says it disregarded Asahi's below-cost sales, as it found 20%

or more of Asahi's sales being sold at prices less than COP. Id. at 31.

Commerce correctly used the model-specific methodology in disregarding sales below the

COP. Pursuant to 19 U.S.C. § 1677b(b)(1) (2001):

> Whenever the administering authority has reasonable grounds to believe or
> suspect that sales of the foreign like product under consideration for the
> determination of normal value have been made at prices which represent less than
> the cost of production of that product, the administering authority shall determine
> whether, in fact, such sales were made at less than the cost of production. If the
> administering authority determines that sales made at less than the cost of
> production–
>
>> (A) have been made within an extended period of time in
>> substantial quantities, and
>>
>> (B) were not at prices which permit recovery of all costs within a
>> reasonable period of time,
>
> such sales may be disregarded in the determination of normal value. Whenever
> such sales are disregarded, normal value shall be based on the remaining sales of
> the foreign like product in the ordinary course of trade. If no sales made in the
> ordinary course of trade remain, the normal value shall be based on the
> constructed value of the merchandise.

The statute also states that:

> Sales made at prices below the cost of production have been made in substantial
> quantities if–
>
>> (I) the volume of such sales represents 20 percent or more of the
>> volume of sales under consideration for the determination of
>> normal value . . . .

19 U.S.C. § 1677b(b)(2)(C)(I). The applicable regulation concerning calculation of NV if sales

are made below cost states:

> In determining normal value, the Secretary may disregard sales of the foreign like
> product made at prices that are less than the cost of production of that product.
> However, such sales will be disregarded only if they are made within an extended

24

period of time, in substantial quantities, and are not at prices which permit recovery of costs within a reasonable period of time. (*See* section 773(b) of the Act.) This section clarifies the meaning of the term "extended period of time" as used in the Act.

19 C.F.R. § 351.406 (2001).

Commerce usually undertakes this substantial quantities test on a model specific basis. Mitsubishi Heavy Indus., 22 CIT at 563. Under the statute, if 20% or more of sales of a specific model of the subject merchandise are below cost, Commerce can exclude them. Id. Commerce first set out its policy in the Policy Bulletin, 92.3 (Dec. 15, 1992), in which it interpreted the then utilized "10/90/10 test,"[11] distinguishing the use of sales on a such or similar basis or model specific basis:

> If the purpose behind the COP provision of the law is to evaluate the rationality of exporters pricing practices, the such or similar approach is appropriate. The price of any model may be a function, among other things, of the price of other models. It is reasonable to believe that from time to time a producer will price certain models at less than COP, but be profitable overall. As an example, an automobile maker may offer low end cars below COP in order to build owner loyalty. In this case, the pricing decision is rational. Is it fair to look at the price of only one model when the prices are set on a product line basis?
>
> If the purpose of the COP provision is to avoid basing FMV on prices below cost (with certain exceptions), the model specific methodology is appropriate, since it

---

[11] The Policy Bulletin explains the 10/90/10 test by saying that

> We compare the home market sales price of each model to the corresponding cost of production. Then we apply the 10/90/10 test to the home market sales of each model sold in the home market. If we find that less than 10 percent . . . of the sales of a model are made at less than cost, we include all home market sales of that model in the calculation of FMV. If between 10 and 90 percent . . . of home market sales of a specific model are made at less than cost,(assuming below cost sales occur over an extended period of time at less than cost recovery prices) we disregard those sales made at less than cost and use the above cost sales in the price comparisons. If more than 90 percent of home market sales of a model are made at less than cost (with the previous assumption), we disregard all sales of that model.

focuses on the prices actually used for FMV. FMV itself is based on a model specific comparison, that of the most similar model. In the price-to-price comparison, the prices of models that are not used in the comparison are irrelevant to the determination of FMV. Similarly, in the cost test, the fact that models not used for comparison are priced above or below cost is irrelevant to determining if the prices to be used for FMV are above or below cost.

We consider that the second method accords more with the departmental practice of calculating model specific FMVs than does the first, and 773(b) directs us to disregard below cost sales in calculating FMV.

The pre-URAA practice of performing the COP test on a model-specific basis was not changed with the enactment of the URAA, as is apparent in the SAA: "[a]s under current practice, the cost test generally will be performed on no wider than a model-specific basis." SAA at 832. By keeping the model-specific methodology for the COP test, Commerce can ensure that respondents do not price their different models in such a way as to be profitable overall and dump goods into the U.S. market simultaneously. Thus, Commerce's decision to use a model-specific methodology is in accordance with law.

Additionally, Asahi's argument that the terms "subject merchandise" and "foreign like product" are used differently in 19 U.S.C. § 1677b(a) and 19 U.S.C. § 1677b(b) and thus lend to a different scope of product treatment, respectively, does not hold water. First, Commerce and Timken point out that 19 U.S.C. § 1677(16) does not describe three separate classes of goods which are subsets of "foreign like product;" instead it provides a hierarchical preference for defining "foreign like product." See Defendant's Response at 33. For, in Ausimont, this court stated that

"Foreign like product" means, in descending order of preference, (1) "identical" merchandise, (2) "like" merchandise that is of approximately equal commercial value, component material, and use, and is produced by the same person and in the same country, or (3) "like" merchandise that is of the "same general class or

kind" and use, and is produced by the same person and in the same country. Slip Op. 02-148 at 18 n.6 (citing 19 U.S.C. § 1677(16)). Under the statute, Commerce must first look at identical merchandise, which it found here, and use it in its below-cost sales test.

Second, Timken makes a convincing argument that taking a model-specific interpretation of the statute is appropriate because "the substantial quantity test is a sub-part of the cost test itself." Timken points out that in SKF USA v. United States, 263 F. 3d 1369, 1382 (Fed. Cir. 2001), the Federal Circuit held that there is a rebuttable presumption that "foreign like product" should be defined consistently, especially where both sections are involved in the same calculation: this is the case with 19 U.S.C. § 1677b(b)(1) and 19 U.S.C. § 1677b(b)(2)(C)(I) which are both used to determine the home market price (NV). See Timken's Response at 48. Finally, Commerce accurately points out that finding a difference between the terms "foreign like product" and "subject merchandise" is contrary to law.

The court agrees with Commerce's reasoning that using the congruent definition of these terms in this context provides for the most accurate dumping margins to be calculated and prevents the calculation of NV based on prices below cost. By using the most specific classification uniformly through the process, Commerce can examine the pricing of a specific type of merchandise and disallow price adjustments among a companies' products. For the stated reasons, the court upholds Commerce's application of the model-specific below cost test to Asahi.

**D**
**Isuzu Is Not Allowed to Rely On Proprietary Information To Support Its Corroboration Argument, After It Failed to Get Timely APO Access In the Underlying Review**

Commerce argues that Isuzu has attempted to rely on proprietary information that it did not have access to during the administrative review without exhausting its administrative remedies. Defendant's Response at 36. Commerce states that Isuzu made an untimely request for an administrative protective order ("APO") which Commerce denied under 19 C.F.R. § 351.305(b)(3)[12]; Isuzu did not appeal. Thus, Isuzu's corroboration arguments regarding the use of adverse facts available were supported by public, non-APO material. Commerce states that, at the commencement of this litigation, Isuzu gained access to APO material through a judicial protective order ("JPO") pursuant to USCIT Rule 71(c). Id. at 40. Commerce thus argues that it has not had the opportunity to consider Isuzu's arguments which it has now supported by proprietary information obtained under the JPO. Id. at 37. Commerce argues that the doctrine of exhaustion requires Isuzu to present claims to the administrative agency before raising them with the court. See 28 U.S.C. § 2637(d); Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998). None of the exceptions to the doctrine, argues Commerce, applies. See Rhone Poulenc, S.A. v. United States, 583 F. Supp. 607, 610 (CIT 1984). Because of Isuzu's failure to

---

[12] Section 351.305(b)(3) states

> To minimize the disruption caused by late applications, an application should be filed before the first questionnaire response has been submitted. Where justified, however, applications may be filed up to the date on which the case briefs are due, but any applicant filing after the first questionnaire response is submitted will be liable for costs associated with the additional production and service of business proprietary information already on the record. Parties have five days to serve their business proprietary information already on the record to applicants authorized to receive such information after such information has been placed on the record.

make a timely APO application and to appeal the APO denial, it cannot use new information to circumvent the administrative process and bolster its arguments before the court. Timken agrees with the Government's argument.

Isuzu argues that Commerce's argument confuses access to proprietary information and a failure to exhaust administrative remedies. It claims that it "presented the same fundamental corroboration argument to the Department in the administrative review as is now before the Court. Simply because Isuzu did not have access to proprietary information, to include it in its argument does not change the nature of the argument." Reply Brief of Plaintiff Isuzu Motors, Ltd. ("Isuzu's Reply") at 17. Isuzu argues that USCIT Rule 71(c) (2001) contemplates the present scenario in its Form 17 certification, part 3, which states:

> I was not . . . subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 71 (c)(5) of the United States Court of International Trade are listed below:
> . . .
> Each of these parties or interested parties has been contacted; none has objected to mu access to proprietary information in this action subject to the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the Court of International Trade.

Thus, Isuzu claims that if Commerce did not find it appropriate for Isuzu's counsel to present arguments using proprietary information, it should not have consented to Isuzu's JPO request and thus have effectively waived the exhaustion argument. Isuzu's Reply at 18.

Under these circumstances, Isuzu may not use information to which it did not have access pursuant to the APO and subsequently received through the JPO to support its arguments. Isuzu's conduct here appears to have been an intentional decision on its part. It erroneously argues that Commerce by consenting to the JPO waived its exhaustion argument. A waiver is an

29

"intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); Former Emples. of Quality Fabricating, Inc. v. United States, Slip Op. 04-48 at 39, 2004 Ct. Int'l Trade LEXIS 48 (May 11, 2004). Counsel for the U.S. Government during the July 7, 2004, oral argument denied the Government had intended to waive any rights in granting the JPO access.[13] The JPO is designed to give parties access to information, but access to information does mean that the information is useable for all purposes. Isuzu may not rely on proprietary information to support its corroboration argument that it did not have access to pursuant to the APO without first exhausting its administrative remedies.

**E**
**Commerce's Determination to Base its AFA Rate On the Highest Calculated Rate and Corroborate Based on Contemporaneous Sales Information, Because Isuzu was Not Cooperative During the Review, Is Supported by Substantial Evidence and Is In Accordance With Law**

Isuzu, as an original equipment manufacturer (OEM) reseller of BBs to the U.S. market, disputes Commerce's imposition of a 73.55% AFA rate. Isuzu argues that the rate chosen, the highest rate for a manufacturer based on partial best information available ("BIA") from the original investigation and its corroboration by examining transaction-specific margins of a cooperating Japanese manufacturer in the present review, is erroneous. Issues and Decision Memorandum at 5. Isuzu argues that it is insufficient for Commerce to say it "has corroborated

---

[13] Counsel elaborated, saying that the granting of JPO access was not a question of waiver because the Government did not object to Isuzu's JPO access and the court's rules allow it. Rather, counsel stated that "because of the way [Isuzu] did not participate in this review and . . . played the system to only participate once they found out they weren't happy with the rate they should not be allowed to rely upon that information to make arguments they did not make during the administrative proceedings."

the adverse factual interferences it uses or "cherry pick" select sales arbitrarily and call this corroboration." Plaintiff Isuzu's Motion for Judgment upon the Agency Record ("Isuzu's Motion") at 13. Relying on F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F. 3d 1027, 1032 (Fed. Cir. 2000) and Am. Silicon Techs. v. United States, 240 F. Supp. 2d 1306, 1312 (CIT 2002), Isuzu argues that the AFA rate chosen is not a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." Issues and Decision Memorandum at 5; see Isuzu's Motion at 11-12.

Isuzu states that because there are Japanese BBs manufacturers, OEM resellers, and trading companies involved in this review, Commerce should recognize the distinctions between them in choosing an AFA rate. Issues and Decision Memorandum at 5; Isuzu's Reply at 19-20. On the one hand, the margins calculated for OEM resellers, Isuzu argues, have typically been among the lowest with rate ranging from .04% to 2.33% and as high as 3.84%; the only rate calculated for Isuzu was .92%. Isuzu's Reply at 19-20. On the other hand, margins for cooperating Japanese BBs manufacturers have ranged from .01% to 48.69%. Furthermore, Isuzu claims that the 73.55% partial-BIA rate was derived from a section of law that has been amended by the URAA because it was creating punitive margins and thus discredits its use in calculating the AFA rate. Issues and Decision Memorandum at 5; Isuzu's Motion at 15. Finally, Isuzu argues that the imposition of an AFA rate using data from twelve year old transactions reduces significantly its probative value for current transactions. Issues and Decision Memorandum at 5; Isuzu's Motion at 16-17. Isuzu thus suggests that Commerce impose a margin rate of 48.69% which was the margin calculated for Nachi in the original investigation.[14] Id. at 27.

_____

[14] Commerce did not choose the margin calculated for Nachi in the original investigation because it chose the highest calculated rate for any company in any portion of this antidumping

31

Commerce argues that, because Isuzu chose not to participate in this review, though having been notified that this decision would result in an imposition of an AFA rate, it was justified in applying a total AFA rate based on the highest rate calculated for any company in any segment of this proceeding. Issues and Decision Memorandum at 6 (referring to Commerce's Memorandum to File (August 31, 2001)). Commerce justifies the use of the 73.55% rate by showing that it derived it during the preliminary stage of the Original Investigation using the petition rate for BIA to analyze specific home-market sales to unrelated parties. Preliminary Determinations of Sales at Less than Fair Value: Antifriction Bearings (Other Than Taper Roller Bearings) and Parts Thereof from Japan, 53 Fed. Reg. 45,343, 45,346 (Nov. 9, 1988). The BIA rate applied in the final determination of the Original Investigation was as a result of Koyo's, a BBs manufacturer, submission of a new response just prior to verification. Original Investigation, 54 Fed. Reg. at 19,102; Final Determination of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Taper Roller Bearings) and Parts Thereof From the Federal Republic of Germany, 54 Fed. Reg. 18,992, 19,033 (May 3, 1989).

Commerce argues that the "selection of the highest rate calculated for any company in any segment of this proceeding as an adverse facts available rate is consistent with out past practice." Issues and Decision Memorandum at 6 (referring to Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Revocation of Orders in Part, 65 Fed. Reg. 49,219 (Aug. 11, 2000) ("AFBs 10")). Commerce states that nothing on the record limits Commerce's ability to choose

investigation and the subsequent reviews: that of Koyo Seiki in the Original Investigation. Nachi's current transaction-specific margins was used purely to corroborate the AFA rate.

dumping margins from any particular types of respondents. Commerce claims to have corroborated the AFA rate with current transaction-specific margins from Nachi Japan, a BBs manufacturer, which it also claims is consistent with past practice. Id. at 7. In its review, Commerce found a number of sales with dumping margins at or above 73.55% which were substantial whether considering the number of transactions, value of transactions, or quantity of transactions. Id. Thus, the AFA rate selected for Isuzu is relevant, continues to have probative value, and is not unduly harsh or punitive. Id.

The Defendant-Intervenor, Timken, argues that, as Isuzu was an uncooperative respondent, Commerce's use of an adverse inference and the 73.55% AFA rate was appropriate. Timken argues that, while 19 U.S.C. § 1677e(c) discusses corroboration, it is not absolute because the statute states "to the extent practicable." Timken's Response at 77. Timken also rebuts Isuzu's reliance on De Cecco and Am. Silicon Techs.; in those cases, although Commerce imposed an AFA rate, the respondents had in fact responded to Commerce's questionnaires, but had done so in an insufficient manner. Id. at 78-80. Here, Isuzu refused to respond to the questionnaire. Timken argues that Commerce acceptably calculated the rate derived from Koyo's margin in the original investigation; its use of margins from 1989 are permitted by statute, see Reiner Brach GmbH & Co. KG v. United States, 206 F. Supp. 2d 1323, 1339 (CIT 2002); and that Commerce utilized margins from producers for calculating the margin is within Commerce's discretion for an uncooperative respondent. Id. at 81-83. Finally, Timken claims that the margin Commerce chose was neither derived through "cherry picked" claims nor was unduly punitive: the responses of "Nachi and Koyo are more or less 'probative' of the potential current margin for Isuzu . . . as the record contains no evidence regarding Isuzu's current sales."

33

Id. at 83.

Commerce's statutory mandate is to determine dumping margins as accurately as possible. Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States, 178 F. Supp. 2d 1305, 1317 (CIT 2001). Commerce must thus gather accurate data from respondents, having given respondents a reasonable opportunity to participate in the review. See Bowe-Passat v. United States, 17 CIT 335, 339 (1993). Ultimately, respondents have the responsibility of creating an adequate record. Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT 931, 936 (1992). Commerce, however, has the statutory authority to use facts otherwise available, subject to 19 U.S.C. § 1677m(c)(1)[15], (d)[16], and (e)[17] if

---

[15] 19 U.S.C. § 1677m(c)(1)states that

> If an interested party, promptly after receiving a request from the administering authority or the Commission for information, notifies the administering authority or the Commission (as the case may be) that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority or the Commission (as the case may be) shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.

[16] Pursuant to 19 U.S.C. § 1677m(d)

> If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle. If that person submits further information in response to such deficiency and either–
>
> > (1) the administering authority or the Commission (as the case may be) finds that such response is not satisfactory, or

(1) necessary information is not available on the record, or

(2) an interested party or any other person–

> (A) withholds information that has been requested by the administering authority or the Commission under this title,

> (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782,

> (C) significantly impedes a proceeding under this title, or

(2) such response is not submitted within the applicable time limits,

then the administering authority or the Commission (as the case may be) may, subject to subsection (e), disregard all or part of the original and subsequent responses.

[17] Pursuant to 19 U.S.C. § 1677m(e)

In reaching a determination under section 703, 705, 733, 735, 751, or 753 the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if–

> (1) the information is submitted by the deadline established for its submission,

> (2) the information can be verified,

> (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,

> (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and

> (5) the information can be used without undue difficulties.

> (D) provides such information but the information cannot be verified as provided in section 782(I),
>
> the administering authority and the Commission shall, subject to section 782(d), use the facts otherwise available in reaching the applicable determination under this title.

19 U.S.C. § 1677e(a) (2001); Reiner Brach, 206 F. Supp. 2d at 1329-30. If Commerce acts in accordance with its statutory requirements and uses total facts available, but finds that

> an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among facts otherwise available. Such adverse inference may include reliance on information derived from –
>
> (1) the petition;
> (2) a final determination in the investigation under this subtitle,
> (3) any previous review under section 1675 of this title or determination under section 1675b of this title, or
> (4) any other information placed on the record.

19 U.S.C. § 1677e(b); See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003). When Commerce applies an adverse inference, it "needs to articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance to the progress of its investigation." Mannesmannrohren-Werke AG v. United States, 77 F. Supp. 2d 1302, 1313-14 (CIT 1999). If Commerce adequately supports these two findings, the court will find that Commerce's use of an adverse inference is supported by substantial evidence. Id.

When a respondent fails to respond to Commerce's requests and the information it requested is material to the investigation, this court has found such behavior to be unreasonable

and the use of AFA appropriate. See Branco Peres Citrus, S.A. v. United States, 173 F. Supp. 2d 1363, 1374-75 (CIT 2001); Am. Silicon Techs., 240 F. Supp. 2d at 1311. In the case of uncooperative respondents, it is within Commerce's discretion to choose the secondary bases on which it will rely to support its use of adverse inferences;

> [p]articularly in the case of an uncooperative respondent, Commerce is in the best position, based on its expert knowledge of the market and the individual respondent, to select adverse facts that will create the proper deterrent to non-cooperation with its investigations and assure a reasonable margin. Commerce's discretion in these matters, however, is not unbounded.

De Cecco, 216 F.3d at 1032. Section 1677e(b) is geared to promote cooperation by respondents, but not impose "punitive, aberrational, or uncorroborated" margins; this is evidenced in the 19 U.S.C. § 1677e(c) corroboration requirement which intends the AFA rate "to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." De Cecco, 216 F.3d at 1032. Thus, the margin selected by Commerce must have some relation to the respondent's dumping margin. At issue in this case is whether Commerce's levying of the particular AFA rate of 73.55% is in accordance with the law because "[t]here is no dispute that Isuzu failed to respond to the Department's questionnaire in the administrative review." Isuzu's Reply at 4. Isuzu does not contest the use of AFA but instead contests the manner in which it was applied and the rate that was chosen.

The court upholds Commerce's imposition of a 73.55% AFA rate on Isuzu. Pursuant to 19 U.S.C. § 1677e(b) and 19 C.F.R § 351.308(c),[18] Commerce may rely on secondary

---

[18] As per 19 C.F.R. § 351.308(c),

> 1) Secondary information, such as information derived from:
>
> (I) The petition;

information[19] from the petition, a final determination in an investigation, previous reviews, and any other information placed on the record to draw its adverse inference.

Here, Commerce chose, consistent with the statute, Koyo's margin which was a part of the final determination from the Original Investigation. While Isuzu argues that Commerce should have taken into account that Isuzu is an OEM reseller and Koyo is a BBs manufacturer in determining the dumping margin, nothing in the statute or the applicable regulation limits Commerce's discretion to choose a surrogate rate based on the type of respondent. Furthermore, as Isuzu refused to participate in the review, it cannot be presumed that Isuzu was not conducting business as a BBs producer or trader. This court has repeatedly held that Commerce's special expertise makes it the "master" of antidumping law, entitling its decisions to great deference from the courts. Heveafil Sdn. Bhd. v. United States, 58 Fed. Appx. 843, 847 (Fed. Cir. 2003); Melamine Chems., Inc. v. United States, 732 F.2d 924, 929 (Fed. Cir. 1984). This court thus defers to Commerce's choice of Koyo's margin as a surrogate rate for Isuzu.

Upon determining that it will use secondary information to draw an adverse inference, Commerce is faced with a corroboration requirement as per 19 U.S.C. § 1677e(c) and the applicable regulation 19 C.F.R. § 351.308(d):

> (ii) A final determination in a countervailing duty investigation or an antidumping investigation;
>
> (iii) Any previous administrative review, new shipper review, expedited antidumping review, section 753 review, or section 762 review; or
>
> (2) Any other information placed on the record.

[19] "Secondary information" is defined in the SAA at 870 as "information derived from the petition that gave rise to the investigation or review, the final determination concerning subject merchandise, or any previous review under section 751 concerning the subject merchandise."

Under section 776(c) of the Act, when the Secretary relies on secondary information, the Secretary will, to the extent practicable, corroborate that information from independent sources that are reasonably at the Secretary's disposal. Independent sources may include, but are not limited to, published price lists, official import statistics and customs data, and information obtained from interested parties during the instant investigation or review. Corroborate means that the Secretary will examine whether the secondary information to be used has probative value. The fact that corroboration may not be practicable in a given circumstance will not prevent the Secretary from applying an adverse inference as appropriate and using the secondary information in question.

Commerce states in the current review that it corroborated its choice of Koyo's rate from the Original Investigation with that of current transaction-specific margins for Nachi Japan. Once again, neither the statute nor the regulation prevents Commerce from using Nachi Japan's margin for this purpose. Furthermore, as Timken points out, pursuant to the "to extent practicable" language in 19 U.S.C. § 1677e(c) and "[t]he fact that corroboration may not be practicable in a given circumstance will not prevent the Secretary from applying an adverse inference as appropriate and using the secondary information in question" language in 19 C.F.R. § 351.308(d), the corroboration requirement itself is not mandatory when not feasible. In this case, Commerce had no current information for Isuzu because Isuzu refused to participate in the review and it used Nachi's rate consistent with its past practice of comparing margins on individual sales by respondents. See Issues and Decision Memorandum at 7. Because of Isuzu's noncooperation, Commerce has leeway in calculating the applicable AFA rate and Isuzu cannot pick and choose which rate it feels would be more appropriate in the circumstance.

**F**
**Commerce's Determination, Challenged by MPB, to Accept NTN's**
**Reported Cost Data is Supported by Substantial Evidence**

MPB argues that Commerce should verify NTN's reported cost data before accepting it for the final results, or alternatively, that Commerce should make the appropriate adjustments on a facts available basis. Issues and Decision Memorandum at 67. MPB claims that NTN's cost data varies starkly from year to year: "changes in costs from the 11th to the 12th review ranged from a decrease of more than [a percentage] to an increase of over [a percentage]; changes in constructed values ranged from a decrease of more than [a percentage] to an increase of over [a percentage]." MPB Corporation's Rule 56.2 Motion for Judgment on the Agency Record ("MPB's Motion") at 6. MPB also argues that while indirect expenses can vary without any apparent justification, costs of labor and materials should not vary so much unless there are changes in technology or some other condition. Issues and Decision Memorandum at 67. MPB also argues that NTN just referred to Attachment D-1 of its section D questionnaire response with no further explanation in responding to MPB's pre-preliminary comments. Id. MPB says that, while NTN responded to Commerce's questionnaire by explaining its variance system, NTN did not explain the "radical increases and decreases reported." MPB's Motion at 9. Thus, MPB argues, while Commerce correctly requested further information specifically about costs from NTN through a supplemental questionnaire at MPB's behest, Commerce's determination to accept NTN's reported costs was not supported by substantial evidence. MPB says that this issue should be remanded to Commerce for further investigation and/or the use of facts available.

NTN argues that it reported its cost data accurately and does not deserve an imposition of facts available. Issues and Decision Memorandum at 67. NTN claims that it was not asked about

40

the cost variances for the 1999-2000 and 2000-2001 administrative reviews and that MPB cannot claim it was unresponsive when Commerce never requested the information. Id. NTN also states that MPB speculates on the causes of the COP variations without an understanding of NTN's cost calculation methods. Id. at 68. NTN states that it reviews its standard costs every half fiscal period and actual cost is calculated by multiplying the standard cost by the variance ration even in situations of non-production. Id. at 67-68. NTN argues that Commerce has verified and found NTN's accounting method to be accurate in prior reviews. Id. at 68.

Commerce states that NTN responded adequately to its supplemental questionnaire regarding its change in costs between the 11th and 12th administrative reviews. It responds to MPB that NTN's reference to Attachment D-1 was an attachment to its January 3, 2002, supplemental response and not its Section D questionnaire. Id. Commerce argues that though it did not verify NTN's cost information, its submitted data was subject to verification. Commerce thus states that it had no reason to reject NTN's explanation of its costs or employ facts available. Id.

Commerce had discretion to accept NTN's reported cost data in calculating its dumping margin in the Preliminary Results and Final Results of this review. On August 31, 2001, NTN submitted questionnaire responses with information concerning COP and constructed value ("CV"). On November 21, 2001, MPB submitted its analysis of NTN's Section D questionnaire, drawing attention to NTN's decrease in costs between the current and previous reviews. On November 29, 2001, Commerce sent NTN a supplemental questionnaire to which it responded on January 3, 2002. MPB filed a letter again citing that NTN's responses were deficient and NTN filed a rebuttal letter on February 14, 2002. MPB and NTN again filed letters with

41

Commerce regarding NTN's cost data on March 14 and 26, 2002, respectively.

Commerce gathered sufficient information to conclude that NTN explained adequately the variances in its costs. In its Section D questionnaire, NTN explained its general cost accounting methodology as well as how changes in its plants and processes affected its reported costs. Defendant's Response at 59. Commerce also notes that "[i]n response to [its] supplemental questionnaire regarding how NTN's cost variances resulted in changes in reported costs, both generally and for specifically requested product categories, NTN provided a detailed explanation of its variance calculation methodology for the specific product categories." Id. Commerce claims that it was able to get this information through NTN's reference to its Attachment D-1 to its supplemental questionnaire response. Commerce thus did not have good cause to verify NTN's cost data or to apply facts available. Id. at 63.

If appropriate, Commerce has discretion not to verify the information it receives. See, e.g., Shakeproof Assembly Components Div. of Ill. Tool Works v. United States, 268 F.3d 1376, 1383 (Fed. Cir. 2001). Commerce requested information from NTN in a supplemental questionnaire and NTN provided answers to the questions it was asked, which Commerce deemed sufficient. Commerce here has articulated a "rational connection between the facts found and the choice made." See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962). Therefore, Commerce's decision to accept NTN's reported cost data is supported by substantial evidence.

42

**G**
**With Regards to NSK Europe, Commerce Has Properly Interpreted**
**"Foreign Like Product" for Calculating Constructed Value**

NSK Europe argued that Commerce erroneously calculated CV-profit because it should

have interpreted and applied the term "foreign like product" in a consistent fashion in the CV-

profit and price contexts. NSK Europe's Motion at 14.[20]  Commerce and Timken point out that

FAG Kugelfisher affirmed Commerce's methodology with respect to its differential use of the

term "foreign like product" for calculating CV profit.

In FAG Kugelfischer, the Federal Circuit upheld Commerce's application of different

subparts of 19 U.S.C. § 1677(16)[21] to define "foreign like product" in the same administrative

---

[20]  NSK Europe, however, concedes in its Reply that a Federal Circuit case cited by both the Defendant and Timken, FAG Kugelfischer George Schafer v. United States, 332 F.3d 1370 (Fed. Cir. 2003), is applicable to this case as it pertains to the issue of "foreign like product" and provides adverse precedent to its position.  NSK Europe's Reply at 7. NSK Europe further states that it had petitioned the Federal Circuit for rehearing, but "if the petitions for rehearing are denied and the decision in *FAG Kugelfischer* upheld, NSK Europe accepts the Federal Circuit's ruling on this matter." NSK Europe's Reply at 7.  During the July 7, 2004, oral argument, counsel for NSK Europe stated it was "withdrawing [the] particular claim based upon . . . FAG Kugelfischer."

[21]      Pursuant to 19 U.S.C. § 1677(16):

> Foreign like product. The term "foreign like product" means merchandise in the first of the following categories in respect of which a determination for the purposes of subtitle B of this title [19 USCS §§ 1673-1671h] can be satisfactorily made:
>
>> (A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
>
>> (B) Merchandise–
>
>>> (i) produced in the same country and by the same person as the subject merchandise,

proceeding. 332 F. 3d at 1373. The Federal Circuit stated:

> Section 1677(16) . . . offers three alternative definitions for foreign like product, which increase in the scope of products that may be included. See 19 U.S.C. § 1677(16). The first available category of merchandise, with which differing determinations may be satisfactorily made, is to be applied. Id. There is no restriction that Commerce use just one subsection per proceeding. Id. Accordingly, we believe that Commerce reasonably explained that the determinations for the variables at issue require different sets of foreign like product data. The bearing market, with its wide disparity in products, necessitates that direct price comparisons be done on a model-by-model basis. Therefore, the use of price comparisons requires the identical model and product family data of sections 1677(16)(A) and (B). And CV profit may be based on a broader scope of products because use of aggregate data, as described in section 1677(16)(C), results in a practical measure of profit that can be applied consistently and with administrative ease over the range of included products.

Id. In this review, as in FAG Kugelfischer, Commerce defined foreign like product for price purposes according to 19 U.S.C. § 1677(16)(A) & (B) and "used data from sales of identical or the same family of products." Defendant's Response at 65. Commerce then applied a broader definition of foreign like product for CV purposes under 19 U.S.C. § 1677(16)(C) which includes merchandise "of the same general class or kind as the subject merchandise." Id. Commerce states that it applied a broader definition because Congress expressed that 19 U.S.C. §

---

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise–

(i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

44

1677b(e)(2)(A) was a preferred methodology for calculating CV. Id.

NSK Europe did not distinguish this case from FAG Kugelfischer in a way that would justify an alternate result.[22]  This court sustains Commerce's methodology as reasonable and not overbroad.  See FAG Kugelfisher, 332 F.3d at 1374.

**H**
**Commerce's Use of AFA in Calculating NTN's Home Market and Freight Expenses Is Supported by Substantial Evidence and Is in Accordance with Law**

MPB argues that Commerce correctly applied AFA to NTN's reported home market and U.S. inland freight expenses.  MPB states that NTN's sales value method is not the most accurate because insurance, which is paid on a value basis, is an expense reported separately and, furthermore, there is no evidence that expensive bearings are more costly to ship than cheaper ones. Issues and Decision Memorandum at 74.  MPB claims that NTN was a noncooperative respondent because it refused to comply with Commerce's request to report the weight of the BBs which is "a logical basis for allocating freight cost for products such as AFBs and is probably more reasonable than sales value." Id.  Thus, MPB argues that NTN should not benefit from its noncooperation and that Commerce should impose an AFA rate.

NTN states that it did report its freight expenses as per Commerce's requirements and to the best of its ability. Id.; see NTN's Rule 56.2 Motion and Memorandum for Judgment on the Agency Record Submitted on Behalf on Plaintiffs, NTN Corporation, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc., and NTN-BCA Corporation ("NTN's Motion") at 6.  NTN says that it submitted evidence on the

---

[22]  The Federal Circuit denied its petition for rehearing. FAG Kugelfisher, 332 F.3d 1370, *reh'g denied*, 2003 U.S. App. LEXIS 19511 (2003) and, as stated above, counsel for NSK Europe withdrew the claim.

record showing how its freight expenses are calculated and that, because it does not maintain data on weight and its weight information is not computerized per bearing, it was not able to calculate freight on a weight basis. Issues and Decision Memorandum at 74; NTN's Motion at 7. Furthermore, NTN claims that its invoices show that freight expenses are incurred on the basis of many factors other than weight, "because multiple variable are used, which are not uniform for each sale"; it calculates its home market freight expenses "based on sales price and allocates its U.S. freight expenses based on value" because that is the only factor common to all shipments. Issues and Decision Memorandum 74-75; NTN's Motion at 7. Arguing that larger BBs are more expensive than smaller ones, NTN states that, contrary to MPB's assertion, there can be a correlation between price and weight. Issues and Decision Memorandum at 75. NTN argues that Commerce accepted this allocation methodology in all previous reviews other than the 1999-2000 review. Id. As a result, NTN argues that Commerce should accept its reported allocation of home market expenses and not apply AFA.

Commerce states that, pursuant to 19 C.F.R. § 351.401 and 19 C.F.R. § 351.402, NTN failed to justify its use of sales value as an allocation methodology. In addition to not being able to justify its allocation methodology, Commerce had asked NTN to report per-unit weight for its BBs in the original and supplemental questionnaires which Commerce had asked it to include in its home-market and U.S. sales database. NTN, Commerce argues, refused to provide this information again claiming that it did not use weight to calculate its freight expenses though it offers this data in its product brochures.[23] Id. at 77-78.

---

[23] Commerce notes that "the size of the sales databases and number of models prevents us from incorporating the weights from NTN's product brochure in the sales database." Issues and Decision Memorandum at 78.

Because NTN withheld information from Commerce twice (in the original and supplemental questionnaires) and failed to act to the best of its ability to explain fully how its allocation methodology based on sales value was not distortive, Commerce deemed appropriate the use of facts available and an adverse inference pursuant to 19 U.S.C. § 1677e. Id. at 78. Commerce also found that because NTN had incurred freight costs, replacing all its home market freight expenses would be inappropriate; Commerce instead calculated NTN's adverse rate based on record information under 19 U.S.C. § 1677e(b)(4) and 19 C.F.R. § 351.308(c)(2). Id. With respect to freight on NTN's U.S. sales, Commerce "assumed that inland-freight expenses that NTN incurred during the POR were incurred for subject merchandise and allocated the total freight expense to those sales." Id. at 79.

Timken supports Commerce's imposition of AFA to NTN's home market and U.S. freight expenses because NTN used allocation methodology based on sales value. Timken argues that Commerce was correct to state that allocation by weight is less distortive. Timken's Response at 59. Furthermore, argues Timken,

> there is no reason in practical experience to believe that freight expense correlates to value. Allocation by value results in under-allocation of freight costs and lower-price sales. U.S. sales at dumped prices (vs. non-dumped U.S. sales) will be allocated lower freight costs, thus understating margins. Conversely, in the home market, higher-priced sales will be allocated higher freight adjustments, reducing normal value.

Timken's Response at 60. Timken also argues that Commerce correctly used its discretion to apply partial AFA because of NTN's lack of cooperation. Moreover, even though Commerce had accepted NTN's methodology in the past, it was not bound to adhere to it. Id. at 66 (citing NSK Ltd. v. United States, 19 CIT 1013, 1027 (1995)).

Commerce justifiably rejected NTN's allocation methodology and applied AFA to the

47

calculation of NTN's home market and U.S. freight expenses.  First, regarding the allocation

methodology, pursuant to 19 U.S. § 1677a(c) (2001)[24], Commerce is directed to adjust the EP or

CEP in certain circumstances.  Under the applicable regulation, 19 C.F.R. § 351.401(b)(1)

(2001), the burden for demonstrating the "amount and nature of the particular adjustment" falls

on the "interested party that is in possession of the relevant information."  Under § 19 C.F.R. §

351.401(g)(1), Commerce "may consider allocated expenses and price adjustments when

---

[24] Under 19 U.S.C. § 1677a(c), Adjustments for export price and constructed export price:

> The price used to establish export price and constructed export price shall be–
>
> (1) increased by–
>
> (A) when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States,
>
> (B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States, and
>
> (C) the amount of any countervailing duty imposed on the subject merchandise under subtitle A to offset an export subsidy, and
>
> (2) reduced by–
>
> (A) except as provided in paragraph (1)(C), the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States, and
>
> (B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 771(6)(C).

transaction-specific reporting is not feasible, provided the Secretary is satisfied that the allocation

method used does not cause inaccuracies or distortions." The party seeking Commerce's

approval of its allocation and adjustment methodology must "demonstrate to [Commerce's]

satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain

why the allocation methodology used does not cause inaccuracies or distortions." 19 C.F.R. §

351.401(g)(2). To reach its conclusion, Commerce must consider records kept by the interested

party and general accounting standards used in that country and industry. 19 C.F.R. §

351.401(g)(3). Thus, based on the regulation, it is within Commerce's discretion to allow or

disallow the allocations and adjustments requested. NTN Corp., 306 F. Supp. 2d at 1328.

Commerce acted within its discretion to reject NTN's allocation methodology based on

sales value instead of by weight. In this review, Commerce requested information on NTN's

allocation methodology even though it had not done so prior to Antifriction Bearings (Other

Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden,

and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and

Revocation of Orders in Part, 66 Fed. Reg. 36,551 (July 12, 2001) ("AFBs 11") and had

previously accepted the methodology.[25] Issues and Decision Memorandum at 77; see Defendant's

Response at 77. Commerce acknowledges this shift and it "has discretion to change its

methodology, so long as its decision is reasonably supported by the record." NTN Corp., 306 F.

Supp. 2d at 1328.

The record here supports Commerce's position that weight is a more appropriate basis for

---

[25] Although NTN argues that Commerce had accepted its allocation methodology in the past, in fact NTN had refused to supply information concerning its allocation methodology in the previous review, AFBs 11, and Commerce had applied an adverse inference. See Issues and Decision Memorandum at 77.

allocation. Weight is not the *only basis* upon which NTN incurs freight expenses, and

Commerce found that the evidence on the record *does not show that sales price is a factor* on

which NTN incurs freight expenses. Issues and Decision Memorandum at 76 (emphasis added);

see Defendant's Response at 74. Commerce found that allocating freight costs based on weight

may include distortions; however, the methodology is less distortive than one that allocates costs

on a basis which, based on the record evidence, no freight expenses are incurred. Issues and

Decision Memorandum at 76. Commerce argues that when it asked NTN in a supplemental

questionnaire to explain how its methodology was not distortive, it gave insufficient answers

arguing that sales value was common to all shipments, freight expense was not allocated by

weight, and that its records do not allocate expenses based on weight. Id. (referring to NTN's

January 3, 2002, supplemental questionnaire response at pages B-1 and C-2). Commerce found

the first argument could be used for weight, while the second was illogical, and the third

argument was false as NTN's product brochure lists weight for all of its BBs. Id. at 76-77.

Commerce further found suspect NTN's argument that larger BBs are more costly than smaller

ones and thus value-based allocation is just as reasonable as one based on weight. Id. at 77.

Based on an assessment of the record, Commerce arrived at a reasonable conclusion. Thus,

Commerce's refusal to accept NTN's allocation based on sales value rather than weight is

supported by substantial evidence.

Commerce also was within its discretion to impost partial AFA to NTN's home market

and U.S. freight expenses. As explained above, pursuant to 19 U.S.C. § 1677e(a)(1)-(2),

Commerce can, among other situations, employ "facts available" in an antidumping proceeding if

"necessary information in not available on the record" or if an interested party "withholds" or

"fails to provide" information requested. If Commerce finds that the party has "failed to cooperate by not acting to the best of its ability to comply with a request for information . . . [Commerce] may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b). To draw this adverse inference, the statute and applicable regulation grant Commerce the ability to rely on the petition, a final determination in the current investigation, any previous review or determination, or "any other information placed on the record." 19 U.S.C. § 1677e(b)(1)-(4); 19 C.F.R. § 351.308(c).

In this review, Commerce presented NTN with an opportunity to explain why its allocation methodology was not distortive, but NTN did not submit adequate responses to the original or supplemental questionnaires. Commerce requested in both questionnaires that NTN provide per-unit weights for its BBs, including the data in its home-market and U.S. sales database, but NTN apparently did not comply and instead replied that it did not use weight in the calculation of its freight expenses. Commerce had the authority to use facts available here because it did not have the requisite information from NTN to conduct this review. And, it rightly used an adverse inference after two specific requests for information for which NTN did not provide useable data. While it was within Commerce's discretion to use any information to support its adverse inference, Commerce chose information that NTN itself had reported. The AFA freight rates with respect to home market freight expenses Commerce chose are most appropriate because it based the rates on the figures NTN submitted from its cost centers in its questionnaire responses. Issues and Decision Memorandum at 78-79. Also, for freight on NTN's U.S. sales, Commerce choice of data was reasonable because it incorporated the data NTN reported during the review along with an adverse inference. Id. at 79. Commerce has

51

calculated the antidumping margin in the most accurate way possible. See Rubberflex DSN.

BHD. v. United States, 59 F. Supp. 2d 1338, 1346 (CIT 1999). Therefore, Commerce's use of

AFA in calculating NTN's home market and U.S. freight expenses is supported by substantial

evidence and is in accordance with law.

## I
## The Court Grants Commerce a Remand To Correct Its Clerical Errors
## Concerning the Treatment of NTN's Freight and Warehouse Expenses

NTN argues that there were clerical errors in the amended final results computer program

that affected the accuracy of the NTN's dumping margin. NTN's Motion at 15. The calculation

apparently failed to exclude EP sales from the calculation of U.S. freight and warehouse

expenses. Id. Commerce concedes that it should not have included EP sales in the calculation of

NTN's U.S. freight and warehouse expenses. Defendant's Response at 87. It thus requests a

remand to correct the clerical errors.

Having reviewed the comments by the parties on this issue, the court remands this action

to Commerce to rectify the clerical errors with regards to its inclusion of EP sales in its

calculation of NTN's freight and warehouse expenses.

**VI**
**CONCLUSION**

For the foregoing reasons Commerce's Review in <u>Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom; Final Results of Antidumping Administrative Reviews</u>, 67 Fed. Reg. 55,780 (Aug. 30, 2002) is remanded in part and sustained in part. Commerce is directed to conform its determination to the instructions in this opinion.


                                                    <u>    /s/ Evan. J. Wallach    </u>
                                                                Judge


Dated:  August 20, 2004
            New York, New York